MARC E. JOHNSON, Judge.
12Pefendant, Edward Irving Harris, appeals his convictions for manslaughter and negligent homicide and his sentences from the 24th Judicial District Court, Division “D”. For the following reasons, we affirm Defendant’s convictions and sentences.
FACTS AND PROCEDURAL HISTORY
On October 14, 1994, around 3:00 p.m., Defendant and his cousin circled the 1600 block of Betty Street in Marrero, Louisiana, apparently looking for Mister Gordon, who was involved in an ongoing dispute with Defendant over a drug deal gone awry. On one of these trips around the block, Defendant approached the stop sign at Betty Street, motioned to another car to proceed through the intersection first, then turned on to Betty Street. Defendant then noticed Mr. Gordon, who was walking with his girlfriend, 19-year-old Tamyra Frazier. Defendant began shooting at Mr. Gordon and Ms. Frazier. His first shot struck Ms. Frazier in the | aback, severing her aorta, causing her death within minutes. Defendant’s remaining four shots struck Mr. Gordon, who was rushed to the hospital.
Police and paramedics arrived shortly after the shooting and pronounced Ms. Frazier dead at the scene. While still at the scene of the shooting, police removed a gun from Mr. Gordon’s waistband and a bag containing several rocks of cocaine. Paramedics then transported Mr. Gordon to the hospital, where he told a nurse and a detective that “Irvin” shot him. Mr. Gordon died in surgery.
After the first trial of this matter in district court case no. 94-6147, a jury convicted Defendant of two counts of first degree murder and sentenced him to death for the murders of Ms. Frazier and Mr. Gordon. On direct appeal, the Louisiana Supreme Court reversed Defendant’s first degree murder convictions and death sentence.[1] The Louisiana Supreme Court then remanded the case to the trial court for a new trial. State v. Harris, 01-0408 (La.6/21/02); 820 So.2d 471, 477.
*918 On November 21, 2002, a Jefferson Parish Grand Jury re-indicted Defendant with two counts of first degree murder of Mr. Gordon and Ms. Frazier, alleged to have occurred on October 14, 1994, in violation of LSA-R.S. 14:80. Defendant was arraigned on January 28, 2003 and pleaded not guilty. Subsequently, the State amended the true bill of indictment on March 3, 2005 to charge Defendant with two counts of second degree murder of Mr. Gordon (count one) and Ms. Frazier (count two), a violation of LSA-R.S. 14:30.1. Defendant was arraigned on the amended charges and entered a plea of not guilty.
The trial for this matter was held before a 12-person jury on September 21-23, 2010. Several witnesses testified at the trial. Aleda Brown York and her 15-year-old cousin Erica Baptiste testified that they had just been dropped off by the Lschool bus and were walking down Betty Street towards Lapalco and Ames Streets on their way to the store when they witnessed the murders of Tamyra Frazier and Mister Gordon. Initially, York and Baptiste were on the right hand side of Betty Street, walking in the direction of Lapalco Street, when they first observed the victims walking towards them.[2] It was testified that Defendant was the front seat passenger in a “brown Regal or a Cutlass” traveling slowly in the same direction in which the victims were walking that allowed them to cross to the opposite side of the street.[3] When they were crossing the street, Baptiste testified that through the front windshield of the car she could see Defendant lean over the driver’s seat and “point a gun out the window.”[4] Within seconds after crossing the street, the shooting commenced, and York looked back to see “Irving” seated in the passenger seat shooting out of the driver’s side window across the street at the victims.[5] York and Baptiste both testified they did not observe Mr. Gordon shooting or pointing a gun at Defendant. Prior to the shooting, both York and Baptiste testified the car was driving slowly and never came to a stop. They did not hear any yelling, but they were close enough to the victims to hear if anyone had yelled. York additionally testified that she did not hear Mr. Gordon shout, “I got something for you b* ⅜ * *» or bear Ms. Frazier shout, “no, no, no, Mister.”
Once the shooting commenced, both York and Baptiste ran to the side of a nearby house to take cover. After the shooting stopped, York and Baptiste went over to the victims and did not see any weapons near or around Mr. Gordon. Once Ifithe police arrived, both York and Baptiste gave statements and also identified Defendant from a photographic lineup.
Another eyewitness to the shooting, Evelyn Williams McCall, testified that on October 14, 1994, she was walking on Betty Street in the direction of Acre Road when the shooting occurred.[6] McCall had *919 just dropped off her rent check on Betty Street when she started walking towards Mr. Gordon and Ms. Frazier. While walking down the street, McCall observed a brown Regal slowly driving down Betty Street and saw shots being fired out of the driver’s side window at the victims.[7] According to McCall, she never observed Mr. Gordon holding or shooting a weapon.[8] McCall testified that they “never had a chance to do anything,” and that Ms. Frazier attempted to run but never had the chance. McCall described the encounter as follows, “[i]t’s like how somebody is just sneaking up on you and catching you off guard, that’s how it was. They never had a chance to do nothing [sic]. She tried to run. As she’s trying to run, she got shot in the back and fell on her face.” McCall testified that Ms. Frazier was shot first, followed by Mr. Gordon, who was shot several times in various locations of his body before the car sped off. McCall also testified that she was approximately two house lengths away from the victims at the time of the shooting and did not hear or see the victims and the individuals in the brown Regal speaking to each other. McCall further testified that, prior to the shooting, she had observed the car in which Defendant riding, slowly driving up and down Betty Street approximately three times that day. Finally, McCall testified that the day after the shooting, a man who identified himself as “Irvin” called an acquaintance of McCall and asked to speak |swith her. Once on the phone, “Irvin” told McCall, “I’m the one who they say killed those people ... I didn’t kill those people.”
Sandra Riggs, an employee with the U.S. Attorney’s Office, was also a witness to the subject shooting. On the day in question, Riggs was driving down Betty Street toward Acres Street when she came to a stop at the intersection of Betty and Linda Streets. Riggs testified there was a school bus dropping children off on the opposite side of the street from her. While stopped at the stop sign to her right at the intersection, Riggs observed a champagne or brown colored Buick traveling on Linda Street that eventually made a right turn onto Betty Street. When the car turned onto Betty Street in front of her, she noticed that the window of the car was partially rolled down and that the driver was wearing a glove. After the car had turned, Riggs testified that she dropped her wallet, and when she leaned down to pick it up, she heard gunshots.[9] Riggs testified that she immediately looked back up and saw Mr. Gordon and Ms. Frazier being shot. According to Riggs, the gunshots were fired from the driver’s side of the Buick towards the victims who were on the sidewalk on the opposite side of the street from the Buick.[10] Riggs also testified that, from her vantage point behind Defendant’s car, she could see that Ms. Frazier, who was on the sidewalk closest to the street, was the first one shot and was followed by Mr. Gordon, who was shot multiple times. Riggs testified she “thought that [Gordon] was going to run, because he began to move his body, motion his body as if he *920 was going to run, and his hand was like more to the front area of his stomach, like holding his stomach area.” After the shooting, Riggs testified that the Buick sped up Betty Street towards Acre Street. Riggs did not observe either victim with a gun at any point in time. Additionally, 17Riggs testified that she did not observe or hear any conversation taking place between the victims and the shooter, explaining that there was not enough time for a conversation to have taken place given the fact that as soon as Defendant’s car turned on to Betty Street, the shooting commenced.
Major Maggie Pernia of the Jefferson Parish Sheriffs Office testified that on October 14, 1994, she was the Sergeant in charge of a squad in the Homicide Division investigating the homicide investigations of Ms. Frazier and Mr. Gordon. As the supervisor, Major Pernia sent her detectives to process the scene of the murder while she relocated to the hospital to conduct an interview with Mr. Gordon. Mr. Gordon was in the trauma unit awaiting surgery for his injuries, but he was not expected to survive. Major Pernia met with Mr. Gordon, identified herself as a police officer, informed him that he was not expected to survive his injuries, and asked Mr. Gordon who had shot him. Mr. Gordon replied, “Irvin.”[11] Finally, when asked whether there was a car involved in the shooting, Mr. Gordon told Major Pernia that a brown Regal occupied by two individuals was involved. Mr. Gordon further advised Major Pernia that he did not know who the driver was and could only describe him as a “black man.” After speaking with Major Pernia, Mr. Gordon was taken into surgery, where he later died.
Next, Detective Dennis Thorton of the Jefferson Parish Sheriffs Office Homicide Division, testified that, as part of his investigation into the shooting deaths of Mr. Gordon and Ms. Frazier, he supervised the collection of evidence and taking of photographs at the scene. Detective Thorton testified he proceeded to the crime scene located at the 1600 block of Betty Street in Marrero where a loaded firearm, which had been found on the body of the victim, and 21 rocks of crack cocaine were collected. Specifically, Detective Thorton testified that the |Rnarcotics were found in a container in the waistband of Mr. Gordon, and the firearm was found “at the small of the back in the pants.”[12] Additionally, while processing the scene, eight 9-mm bullet casings and blood were collected.[13] Detective Thorton also testified that autopsies were performed on both victims, and that projectiles were recovered from their bodies.[14] Finally, Detective Thorton testified an attempt to recover the firearm that fired the lethal shots was made; however, they were unable to locate it in their efforts. On cross-examination, Detective Thorton testified that three days after the *921 subject shooting, Defendant turned himself in to the police.
The State also called Dr. Frazier McKenzie of the Jefferson Parish Coroner’s Office to the stand to testify as an expert in the field of forensic pathology. Dr. McKenzie testified that he performed the autopsies of Mr. Gordon and Ms. Frazier. With regard to Ms. Frazier, Dr. McKenzie classified the cause of death as a single gunshot wound to the body, which perforated her lungs, trachea, and aorta. Dr. McKenzie testified that the bullet entered Ms. Frazier’s right back. With regard to Mr. Gordon, Dr. McKenzie classified the cause of death as four gunshot wounds, three fatal to the body, which perforated the lungs, kidney, intestinal tract and left external iliac artery. Dr. McKenzie testified that the entrance wounds found on Mr. Gordon were located on his right lower back, right mid-back, left side, and right hip.
Officer Michael Tillman of the Jefferson Parish Sheriffs Office testified that on October 14, 1994, he was on patrol when he responded to a call concerning a|9shooting at the 1600 block of Betty Street. Upon arrival at the scene, Officer Tillman observed a young man and woman who had been shot. Officer Tillman approached Mr. Gordon and recovered narcotics from the front of his pants and a handgun from “the back belly area tucked in the pants.” On cross-examination, Officer Tillman testified that Mr. Gordon’s body was located in a courtyard between two apartments in the Housing Authority Projects on Betty Street, not located in the street.[15]
Lastly, Louise Waltzer, senior crime examiner, who was employed by the Jefferson Parish Sheriffs Office Crime Laboratory at the time of the subject incident, testified on behalf of the State. After being qualified as an expert in the field of firearms examination, Waltzer testified that she examined various firearms evidence in this case. Specifically, Waltzer testified that she was asked to determine whether a particular weapon, the Lorcin 380 semiautomatic pistol found on Mr. Gordon at the time of the shooting, had fired any of the cartridge casings recovered at the scene. After analyzing the evidence, Waltzer concluded that of the eight casings recovered at the scene, none of them had been fired from the Lorcin 380 pistol. Waltzer further concluded that the Lorcin 380 pistol had not been discharged that day. Additionally, Waltzer concluded that, as far as the fired cartridge casings were concerned, every single round fired that day was indicative of having been fired from a 9-mm Glock.
The State rested, and Defendant and several other witnesses testified during the defense’s case-in-chief.
First, Jonathan Issac, a previously convicted felon, testified that he knew Defendant and Mr. Gordon from six or seven drug deal encounters. Issac testified that Defendant was Mr. Gordon’s drug “runner” or “mule.” Issac further testified |,nregarding one particular occasion, about two weeks before the shooting, where he substantially diluted one of Mr. Gordon’s cocaine orders with “Bisquick.” Issac testified that when the defendant arrived to pick up Mr. Gordon’s 250 grams of cocaine in exchange for $5,000.00, Issac, unbeknownst to Defendant, gave him the “Bisquick” mixture instead. After receiving the mixture, Issac testified that he was contacted by Mr. Gordon who “wasn’t satisfied with the package.” Despite advising *922 Mr. Gordon that he was the one who had diluted the package, Issac testified that Mr. Gordon appeared mad at Defendant, holding Defendant responsible for the “Bisquick” package he had received. Issac further testified that it was his impression that Mr. Gordon wanted to hurt Defendant if his money was not returned.[16] According to Issac, Defendant spoke to him on a few occasions appearing “scared” about the “Bisquick” issue with Mr. Gordon. Issac testified that he told Defendant to “lay low for a while, and give [him] a chance to take care of it.”
Next, Terrence Johnson testified that he knew both Mr. Gordon and Defendant from the neighborhood. On one occasion, approximately two weeks before the shooting, Johnson testified that he and Defendant were in a bar called Buddy’s Lounge when Mr. Gordon pulled up in his Mercedes. According to Johnson, Mr. Gordon made a gesture with his hand, as if he was firing a gun, towards Defendant.[17] After Mister Gordon drove off, Johnson asked Defendant “what’s going on?” to which Defendant responded, “nothing man, don’t worry about that.” Johnson further testified that, based on the 16 years he has known Defendant, has never known him to be violent. Johnson further testified about one occasion, about two or three days before the shooting, where Mr. Gordon had Income looking for Defendant. At that time, Johnson observed Mr. Gordon with a handgun on the front seat of his car and believed that he was looking for Defendant to shoot him.
Hubert Smith also testified on behalf of the defense. Smith testified that he lives across the street from Defendant’s grandmother, who Defendant was staying with at the time, when Mr. Gordon arrived. Smith testified that he saw Mr. Gordon exit his car with a gun and argue with Defendant’s grandmother. Smith further testified that he did not personally relay what he had seen to Defendant.[18]
Natasha Frazier then testified that her sister, Ms. Frazier, was one of the victims in this case; and at the time of the shooting, she was dating Defendant. Frazier testified that her sister and Defendant “got along fine,” but that prior to the shooting, Defendant and Mr. Gordon were angry with one another over the “Bisquick” drug deal.[19] One day before the shooting, Frazier testified that she remembered Mr. Gordon say, “Irvin better give him his money or something is going to happen,” but she did not relay this information to Defendant.[20] Frazier also testified that Defendant told her that he was “going to get Mister.”[21] On cross-exami *923 nation Frazier testified that Defendant did not have a job and made his money by selling drugs. Frazier testified to seeing Defendant with a gun a few times before the shooting, including one night when they spent the night in a hotel and also when he went to Sonny’s house. Frazier testified that after the shooting, Defendant told her that he did not shoot the victims, but he knew who did; | ^however, he could not tell because “they would hurt him.” Frazier further testified that she initially believed him, until she found out the truth several years later.
Finally, Defendant testified on his own behalf. Defendant testified that he was 18 years-old when he turned himself in for the shootings of Mr. Gordon and Ms. Frazier. Specifically, Defendant admitted that he shot the 9-mm weapon that killed the victims. Additionally, Defendant testified that he had no prior convictions.
Defendant testified that he knew Ms. Frazier from school, and that they were “close” as a result of him having dated the victim’s sister. According to Defendant, around the time of the shooting, he was working for Mr. Gordon as a “runner” or “mule,” transporting money and drugs. Defendant testified that on one particular occasion, he picked up a wrapped package of cocaine from Issac and delivered it to Mr. Gordon. He later learned that the package had been filled with “Bisquick.” Once Mr. Gordon learned of this, Defendant testified that Mr. Gordon demanded that Defendant get him his money back or something would happen to him. After the “Bisquick” incident, Defendant testified that he and Mr. Gordon did not get along.[22] Additionally, Defendant testified that prior to the “Bisquick” incident, he only carried his gun around with him occasionally; but after the “Bisquick” incident, he began carrying his gun with him every day because he was scared that Mr. Gordon was going to kill him.[23] Defendant further testified that he contacted Issac to fix the problem that he had caused with the “Bisquick,” but Issac never did. Defendant also testified that he is not a violent person and never threatened to harm Mr. Gordon.
1130n the day of the shooting, Defendant testified that he was driving his beige Buick Regal, with his cousin, Sonny, in the passenger’s seat.[24] Defendant stated that he had just picked up Sonny and proceeded to Betty Street to pick up his girlfriend Natasha. Defendant testified that he turned off of Linda Street onto Betty Street and saw Mr. Gordon and Ms. Frazier walking down the street. According to Defendant, he did not anticipate encountering Mr. Gordon on Betty Street because Mr. Gordon lived in the Woodmere Subdivision in Harvey. Defendant further testified that when he saw Mr. Gordon, it was broad daylight; so, he was not concerned and did not believe his life was in jeopardy “given the circumstances.”[25] Upon seeing *924 Mr. Gordon and Ms. Frazier, Defendant testified that he pulled his car up to Ms. Frazier to ask her where her sister was but had not come to a complete stop, when Mr. Gordon came up from behind her with his hand on his gun.[26] Defendant testified that Ms. Frazier stated “no, no, no,” and Mr. Gordon, with his hand on the handle of his gun by the back of his waistband, said “I got your b* * * * a* so, he got scared and shot. Defendant testified he did not aim the gun out of the window but ducked and fired the gun without looking or aiming it at anyone.
On cross-examination, Defendant testified that prior to turning himself over to the police, he disposed of the gun used to shoot the victims because he was scared.[27] Defendant further testified that he never made any effort to get the gun |14back before turning himself over to the police. Defendant stated that he did not speak with his girlfriend, the victim’s sister, until after he had been arrested because he did not know if he had hit anyone at the time of the shooting. He testified that he did not become aware of what had happened until he saw it on the news the next day. Defendant also testified that after he began receiving threats, he chambered a round of ammunition in the gun, so it would be ready for use.[28]
On rebuttal, the State presented the testimony of Federal Agent James Sewell. Sewell, an agent for the Drug Enforcement Administration, testified he has become familiar in his experience with the primary movers of narcotics in the Marre-ro, Harvey, and Gretna areas, and that Mr. Gordon was not one of them in 1994. Additionally, based on Mr. Gordon’s arrest summary, Sewell testified that Mr. Gordon had never been arrested for crimes of violence, or narcotics.[29]
After considering the evidence presented at trial, the jury found Defendant guilty of the responsive verdicts of manslaughter as to count one for Mr. Gordon and negligent homicide as to count two for Ms. Frazier. On October 1, 2010, the trial court sentenced Defendant to 40 years imprisonment at hard labor on count one and five years imprisonment at hard labor on count two. The trial court further ordered the sentences on both counts to run consecutively, giving Defendant credit for the time he had served from October 17, 1994.
On October 6, 2010, Defendant filed a letter with the trial court, moving for reconsideration of his sentence based upon the excessive nature of the sentences imposed, and the trial court’s failure to consider relevant mitigating factors. On October 13, 2010, defense counsel filed a written motion to reconsider sentence, ar *925 guing that the sentences were excessive and should be reduced. On October 25, | is2010, the trial court denied Defendant’s motions to reconsider sentence. Subsequent to the denial of his motion to reconsider sentence, Defendant filed a second motion to reconsider sentence on November 9, 2010. The trial court again denied Defendant’s motion as untimely and repetitive.
Defendant filed a motion for appeal on October 13, 2010, which was granted by the trial court on the same date. Defendant now timely appeals his convictions and sentences.
ASSIGNMENTS OF ERROR
On appeal, Defendant raises the following assignments of error: 1) there was insufficient evidence presented by the State to support the convictions; 2) the trial court erred in denying his motion for reconsideration; and 3) the trial court erred in imposing constitutionally excessive sentences.
LAW AND ANALYSIS

Assignment of Error Number 1

Defendant does not contest that he fired the gun at the victims and caused their death. Rather, in his first assignment of error, Defendant argues that the unrebut-ted evidence presented at trial suggests that the homicide was justifiable because it was done in self-defense. Specifically, Defendant contends that none of the State’s eyewitnesses were able to contradict Defendant’s own testimony regarding the events surrounding the shooting. Additionally, because he claims the State did not prove the shooting was not done in self-defense, Defendant asserts that the evidence was insufficient to convict him of manslaughter and negligent homicide.
The State responds that the evidence at trial was sufficient to prove the charged offense of second degree murder. The State also argues that Defendant’s self-defense theory lacks merit because the testimony of the State’s witnesses | ^establishes that his vehicle came from behind the victims, who had no opportunity to defend themselves before Defendant opened fire on them. Moreover, the State asserts that while Mr. Gordon possessed a firearm at the time of the incident, no witnesses corroborated Defendant’s self-serving testimony that Mr. Gordon placed his hand on his gun located at his rear waistband, causing Defendant to become frightened and shoot both victims.
The defense did not object to the trial court’s failure to provide a jury instruction on “self-defense;” however, throughout the trial and during closing argument, the focus of Defendant’s theory of the case was that the homicides in this case were justified because they were committed in self-defense.[30]
In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact *926 that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Neal, 00-0674 (La.6/29/01); 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002). In cases involving circumstantial evidence, the trial court must instruct the jury that, “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” LSA-R.S. 15:438.
The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the Impossible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. State v. Mitchell, 99-3342 (La.10/17/00); 772 So.2d 78, 83; State v. Washington, 03-1135 (La.App. 5 Cir. 1/27/04); 866 So.2d 973, 977.
In this case, Defendant was charged with the second degree murder of Mister Gordon and Tamyra Frazier but was convicted of the responsive verdicts of manslaughter as to Mr. Gordon and negligent homicide as to Ms. Frazier.[31] LSA-R.S. 14:31 delineates two theories of manslaughter: specific intent manslaughter and felony/misdemeanor manslaughter. Under LSA-R.S. 14:31, subd. A(l), manslaughter is a first or second degree murder that is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. In addition, LSA-R.S. 14:32(A) provides that negligent homicide is the killing of a human being by criminal negligence. LSA-R.S. 14:12 provides that criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender’s conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.
Here, Defendant does not argue that the State failed to prove the elements of manslaughter or negligent homicide. Rather, he contends that the State failed to prove that Defendant did not act in self-defense. According to LSA-R.S. 14:20, a homicide is justifiable “[w]hen committed in self-defense by one who reasonably [ 18believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.”
The fact that an offender’s conduct is justifiable, although otherwise criminal, constitutes a defense to prosecution for any crime based on that conduct. LSA-R.S. 14:18. When a defendant claims self-defense in a homicide case, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense. State v. Cassard, 01-931 (La.App. 5 Cir. 2/26/02); 811 So.2d 1071, 1076, writ de *927 nied, 02-0917 (La.12/19/02); 833 So.2d 327. The relevant inquiry on appeal is whether a rational fact-finder, after viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the homicide was not committed in self-defense. Id.
The determination of a defendant’s culpability focuses on a two-fold inquiry: 1) from the facts presented, could the defendant reasonably have believed his life to be in imminent danger, and 2) was deadly force necessary to prevent the danger. State v. T.N., 94-669 (La.App. 5 Cir. 1/18/95); 650 So.2d 288, 289. While there is no unqualified duty to retreat from an altercation, the possibility of escape is a recognized factor in determining whether or not a defendant had a reasonable belief that deadly force was necessary to avoid the danger. Id., 94-669, 650 So.2d at 290. Additionally, a person who is the aggressor or who brings on a difficulty cannot claim self-defense, unless he withdraws from the conflict in good faith. State v. Mills, 04-489 (La.App. 5 Cir. 3/29/05); 900 So.2d 953, 959, writ denied, 05-1470 (La.1/13/06); 920 So.2d 235. The jury is the ultimate fact-finder in determining whether a defendant proved his condition and whether the State negated the defense beyond a reasonable doubt. State v. Theriot, 07-71 (La.App. 5 Cir. 6/26/07); 963 So.2d 1012, 1020, writ denied, 07-1598 (La.2/1/08); 976 So.2d 715.
I^Based on the following, we find that the jury reasonably could have concluded that Defendant could not have believed that he was in imminent danger of losing his life or receiving great bodily harm, and that the State adequately negated the defense of justification beyond a reasonable doubt.
All four eyewitnesses, McCall, York, Baptiste, and Riggs, testified that the victims were walking on the sidewalk on the opposite side of the street from Defendant’s car, when they were gunned down without any prior conversation or brandishing of a weapon taking place before the shooting. Specifically, both York and Baptiste testified that the victims were walking down the street when Defendant’s car came up from behind them. Baptiste, who crossed within an “arm’s length” in front of Defendant’s car, testified that she saw Defendant lean over the driver’s seat, and shoot at the victims who were across the street. Both York and Baptiste also testified that Defendant’s car never stopped, and they did not hear any words exchanged between the victim and Defendant or see Mr. Gordon with a gun. Another eyewitness to the shooting, McCall, testified that she was walking on Betty Street, approximately two house lengths away from the victims, when she saw shots being fired from the driver’s side window of Defendant’s car. McCall further testified that the victims never exchanged words with the occupants of the car, and in fact, “never had a chance to do anything” because they were “caught off guard.” Additionally, McCall had seen Defendant’s car driving slowly up and down Betty Street three times that day. Finally, the fourth eyewitness, Riggs, testified that Defendant’s vehicle turned in front of her onto Betty Street when she observed gunshots being fired from the driver’s side of the car at the victims who were on the sidewalk on the opposite side of the street and not close to Defendant’s car. Riggs also testified she did not observe either victims with a gun or hear any conversation take place prior to the shooting.
12nWhile a handgun was eventually recovered from the rear waistband of the Mr. Gordon, it was fully loaded and had not been discharged or removed from his waistband, supporting the testimony of the eyewitnesses. Moreover, the evidence *928 presented at trial establishes that Defendant’s vehicle came up from behind the victims, who were walking on the sidewalk opposite Defendant’s vehicle and were shot in the back.[32] (See State v. Favorite, OS-425 (La.App. 5 Cir. 11/25/03); 862 So.2d 208, 214, writ denied, 03-3529 (La.4/23/04); 870 So.2d 298, where this Court recognized that the jury could have concluded the victim was the initial aggressor, but the defendant became the aggressor and his claim of self-defense was not supported by the facts of the ease, including the findings that at least some of the bullets entered the victim from behind.)
While Defendant introduced the testimony of two neighbors and a previously convicted felon responsible for the subject “Bisquick” incident who believed Mr. Gordon wanted to hurt Defendant, the State also presented the testimony of Natasha Frazier who testified that Defendant told her he was “going to get Mister.” Additionally, Defendant admitted that he fled the scene and disposed of the weapon. It can be argued Defendant’s flight from the scene after the incident, despite having turned himself in three days later, is inconsistent with a theory of justifiable homicide. (See State v. Wallace, 612 So.2d 183, 191 (La.App. 1 Cir.1992), writ denied, 614 So.2d 1253 (La.1993). A defendant’s flight and attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience. State v. Caze-nave, 00-183 (La.App. 5 Cir. 10/31/00); 772 So.2d 854, 860, writ denied, 00-3297 (La.10/26/01); 799 So.2d 1151.) Moreover, not a single witness testified at trial in support of Defendant’s 121 portrayal of events that occurred that day. In particular, it is only Defendant’s self-serving testimony which indicates that Mr. Gordon had his hand on the handle of his gun when he stated, “I got your b* * * * a* *,” before Defendant reached down to the floor of his car, grabbed his gun, ducked, and began firing “without looking” as he drove off. Instead, the evidence suggests that Defendant, who was seen circling the block, drove by his intended target without stopping, to execute his plan of attack previously relayed to Natasha Frazier. “The law does not permit an individual to track down his enemy, shoot him with a firearm, and then claim justification for the homicide because of prior threats.” State v. Patterson, 10-415 (La.App. 5 Cir. 1/11/11); 63 So.3d 140, 151, writ denied, 11-0338 (La.6/17/11); 63 So.3d 1037, citing State v. Arabie, 496 So.2d 554, 558 (La.App. 1st Cir.1986), writ denied, 502 So.2d 565 (La.1987).
Moreover, even if the jury had believed Defendant’s testimony that Mr. Gordon had his hand on his gun, we find Defendant was in a moving car that never came to a complete stop; that the victims were walking on the sidewalk on the opposite side of the street with their backs turned to him; and that Defendant could have easily accelerated and escaped the alleged danger rather than using deadly force.[33]
After listening to the testimony and considering the other evidence, we find that the jurors clearly found the testimony offered by the State’s witnesses to be more credible than the testimony of Defendant and did not believe Defendant committed the homicide in self-defense. *929 The jury is the ultimate fact-finder in determining whether a defendant proved his condition and whether the State negated the defense beyond a reasonable doubt. State v. Hyman, 09-409 (La.App. 5 Cir. 2/9/10); 33 So.3d 271, 278 (citing Theriot, supra). The credibility of a witness is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; therefore, the credibility of witnesses will not be reweighed on appeal. State v. Macon, 06-0481 (La.6/1/07); 957 So.2d 1280, 1285-86; State v. Rowan, 97-21 (La.App. 5 Cir. 4/29/97); 694 So.2d 1052, 1056. Therefore, the State adequately negated the defense of justification beyond a reasonable doubt. Accordingly, we find that a rational fact finder, after viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the homicides of Mr. Gordon and Ms. Frazier were not committed in self-defense.
Therefore, we affirm Defendant’s convictions.
Assignments of Error Numbers 2 and 3[34]
In his second and third assignments of error, Defendant argues that his 40-year sentence for manslaughter and 5-year sentence for negligent homicide, ordered to run consecutively, are excessive given the mitigating factors in this case. Specifically, Defendant contends that the maximum sentences imposed by the trial court is excessive based upon the jury’s conviction of lesser responsive verdicts; Defendant was only 18 years old at the time of the offense and had never been previously convicted of a crime; and he had already spent over 16 years in prison, six of which were spent on death row. Had the court considered these factors, Defendant argues that the maximum consecutive sentences, reserved for the worst type of offender, would not have been imposed. Finally, Defendant contends that concurrent, rather than consecutive sentences should have been imposed where both of Defendant’s counts arise out of the same act or transaction.
The State responds that the trial court did not abuse its broad sentencing discretion, and Defendant’s sentence is appropriate based on the offenses | ^committed. Additionally, the State asserts that because the evidence presented at trial was sufficient to support convictions on the charged offenses of second degree murder, Defendant’s sentences fall short of the life terms that could have been imposed had Defendant been found guilty as charged.
Defendant was originally charged with two counts of second degree murder but was convicted by a jury of the lesser charges of manslaughter (count one) and negligent homicide (count two). Defendant was sentenced to the maximum term of imprisonment for both counts — 40 years at hard labor on the manslaughter conviction and five years at hard labor on the negligent homicide conviction. LSA-R.S. 14:31 B; and 14:32 B. The trial court further ordered Defendant’s sentences to be served consecutively.
Prior to sentencing Defendant, the trial court listened to a victim impact statement from Mr. Gordon’s father and also heard from Defendant regarding his remorse and intended plan of action upon release. Specifically, Defendant stated that upon his release, he intended on living with his fian-cée and would help run her janitorial franchise or work in Alaska on the “BP Pipeline.” Additionally, Defendant stated that he would obtain his “social degree” within two years of his release and also work with *930 “divine youths to prevent them from criminal and negative behavior.” Defendant’s attorney then spoke on Defendant’s behalf. Defense counsel referenced the letters provided to the court from various members of society, including friends of Defendant, a general foreman for a corporation who indicated that Defendant could work as an assistant to a pipe fitter in Alaska upon his release, and a school teacher who indicated that Defendant’s experience would be of great service to working with troubled youth. Defense counsel further requested leniency with respect to Defendant’s sentencing, noting he was only 18 1^years old when he committed the subject offenses, was a first time offender, and had accepted full responsibility for his actions.
The trial court sentenced Defendant to the maximum terms of imprisonment for his manslaughter and negligent homicide convictions, reasoning as follows:
I have raised five children and one of the things that I really tried to get across to them was that they leave the expectation level, and move to the level of accomplishing things and getting things done. Now, I know that you can write well. I know that you’re diligent in trying to get out of jail. But I not [sic], for the record, and I saw it in your letter, and when you read it you intend to accomplish things if I were to give you a lenient sentence. You’ve been there sixteen years and I’ve heard that over and over. You had time to accomplish things and I’ve heard none of those. I’ve heard about your intention to start accomplishing things if I will do something for you. And it’s a level that you need to overcome. You’ve got great capability, but it’s not contingent upon me doing something. You’re in control of your own destiny and in your writing you talk in terms of you will get a GED, and you will accrue some educational background while your [sic] there. Well, you could have done these things up until now.
[[Image here]]
The court notes that the offender, you, Mr. Harris, created risk of death or great bodily harm to more than one person. That you used a dangerous weapon, a firearm, and the serious offenses involve multiple youthful victims. Not just the ones that were hit, but the other people, the potential victims that [sic] were in the area when you shot. The offenses further involve control [sic] dangerous substances and transactions, unless the sentences would depreciate the seriousness of these crimes ... The Court sentences the defendant as follows ... the sentences ... are to run consecutively ... In spite of being part of the Defendant’s actions on the same date October 14, 1994 the Court expressly finds that the Defendant’s actions were particularly negligent on the respective counts resulting in the violent deaths of two young people, and the potential deaths of others in the area.
The Court now makes a specific finding, the Defendant imposes an unusual risk to society thus warranting the consecutive sentences.
After sentencing, Defendant filed a letter with the court asserting that the sentences imposed were constitutionally excessive because the aggravating factors used to sentence Defendant were not present in his case, as evidenced by the jury’s finding of manslaughter and negligent homicide rather than second degree murder. Moreover, Defendant asserted that had a presentence investigation (“PSI”) been | ^conducted, the trial court would have learned that while on death row, he was in school to obtain his GED, was also a teacher in the program before it was cancelled due to an inmate fight, and had *931 been the trustee of the Islamic services for over six years.[35] Based on this information, Defendant argued that the trial court should have, at the very least, ordered his sentences to run concurrently, rather than consecutively.
On October IB, 2010, defense counsel filed a motion to reconsider sentence based on the arguments set forth at the time of sentencing, and the fact that Defendant’s sentences were excessive and should have been reduced. On October 25, 2010, the trial court denied Defendant’s motion to reconsider sentence.[36] On November 9, 2010, Defendant filed a second motion to reconsider sentence, which was again denied by the trial court on the grounds that it was proeedurally barred and repetitive.
By imposing maximum consecutive sentences on Defendant’s manslaughter and negligent homicide convictions, he contends the trial court failed to consider pertinent mitigating factors prior to sentencing. Defendant argues the trial court failed to consider his history and background, including his lack of prior criminal activity, his age, convictions for lesser offenses, and the potential for rehabilitation.
The test imposed by the reviewing court in determining the exces-siveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in LSA-C. Cr. P. art. 894.1. The trial judge is |2finot required to list every aggravating or mitigating circumstance, so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983). The articulation of the factual basis for a sentence is the goal of LSA-C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with LSA-C.Cr.P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). The important elements which should be considered are the defendant’s personal history (age, family ties, marital status, health, and employment record), prior criminal record, seriousness of offense, and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981). There is no requirement that specific matters be given any particular weight at sentencing. State v. Tracy, 02-227 (La.App. 5 Cir. 10/29/02); 831 So.2d 503, 516, writ denied, 02-2900 (La.4/4/03); 840 So.2d 1213, citing State v. Jones, 33,111 (La.App. 2 Cir. 3/1/00); 754 So.2d 392, writ denied, 00-1467 (La.2/2/01); 783 So.2d 385.
Second, a sentence violates La. Const, art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffer *932 ing. State v. Smith, 01-2574 (La.1/14/03); 839 So.2d 1; State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, 01-0467 (La.1/15/02); 805 So.2d 166; State v. Lobato, 603 So.2d 739 (La.1992); State v. Lawson, 04-334 (La.App. 5 Cir. 9/28/04); 885 So.2d 618, 622.
However, the trial judge has wide discretion in determining a sentence, and the court of appeal will not set aside a sentence for excessiveness if the record |27supports the sentence imposed by the trial judge. State v. Taylor, 02-1063 (La.App. 5 Cir. 2/25/03); 841 So.2d 894, 899, writ denied, 03-0949 (La.11/7/03); 857 So.2d 516. A reviewing court may not set a sentence aside absent a manifest abuse of discretion. State v. Guzman, 99-1753 (La.5/16/00); 769 So.2d 1158, 1167. The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate. State v. Dorsey, 07-67 (La.App. 5 Cir. 5/29/07); 960 So.2d 1127, 1130; State v. Jones, 99-2207 (La.1/29/01); 778 So.2d 1131, 1133 (per curiam). Three factors are considered in reviewing a judge’s sentencing discretion: 1) the nature of the crime; 2) the nature and background of the offender; and 3) the sentence imposed for similar crimes by the same court and other courts. State v. Le, 98-1274 (La.App. 5 Cir. 6/30/99); 738 So.2d 168, 171, writ denied, 00-2174 (La.4/12/01); 789 So.2d 587.
Moreover, deterrence is a legitimate sentencing object, even though a defendant has demonstrated efforts to reform. State v. Howard, 262 La. 270, 263 So.2d 32 (1972); State v. Tully, 430 So.2d 124 (La.App. 2nd Cir.1983), unit denied, 435 So.2d 438 (La.1983).
In the present matter, the record reflects that the trial judge did consider the letters received on Defendant’s behalf, the victim impact statement, and Defendant’s own statement to the court at the time of his sentencing, as evidenced in the trial judge’s reasons for the sentences imposed. At Defendant’s sentencing, the trial judge noted Defendant had been in prison for 16 years and, during that time, has failed to accomplish the goals proposed to be accomplished by Defendant. Additionally, the trial judge noted that Defendant “created risk of death or great bodily harm to more than one person ... not just the ones that were 12⅜1⅞ but the other people, the victims that were in the area.”[37] During the commission of the homicides, which involved multiple youthful victims and controlled dangerous substances, Defendant used a firearm; thus, any lesser sentence would depreciate the seriousness of the crimes. Finally, the trial court concluded that consecutive sentences were warranted because Defendant imposed an unusual risk to society. Therefore, the trial court gave a sufficient basis for the sentences, and the sentences are supported by the record.
Moreover, the evidence adduced at trial would have supported two second degree murder verdicts, and the exposure to two mandatory life sentences. LSA-R.S. 14:30.1. Although Defendant contends that the jury’s finding of guilt to *933 the lesser charges of manslaughter and negligent homicide are indicative that the shooting was caused by provocation, evidence was presented at trial that established Defendant had the specific intent to kill Mr. Gordon or, at the very least, inflict great bodily harm; accordingly, the responsive verdicts of manslaughter and negligent homicide were compromises and were valid verdicts under the law. Specifically, the evidence presented at trial established the victims were walking down the sidewalk when Defendant’s vehicle drove up from behind them, and he fired eight rounds of bullets at them without any testimony, other than Defendant’s, to establish that any provocation or justification for the shooting existed. “Deliberately pointing and firing a deadly weapon at close range are circumstances which will support a finding of specific intent to kill.” State v. Batiste, 06-869 (La.App. 5 Cir. 4/11/07); 958 So.2d 24, 27. Additionally, the law does not require that the intent to kill be at the specific victim, but only that the |Mdefendant had the intent to kill someone. State v. Hall, 606 So.2d 972 (La.App. 3rd Cir.1992), unit denied, 93-0051 (La.11/11/94); 644 So.2d 385.
In State v. Lewis, 09-1404 (La.10/22/10); 48 So.3d 1073, cited by the State, the Louisiana Supreme Court reinstated the 16-year-old first time offender’s sentence, originally vacated by this Court, finding that the trial court acted within its discretion when it imposed a 30-year sentence for defendant’s manslaughter conviction. In Lewis, a 16-year-old defendant was charge with second degree murder and convicted of the lesser offense of manslaughter. The defendant was sentenced to 30 years imprisonment. The defendant appealed, and this Court vacated his sentence despite the finding that the evidence at trial supported the responsive verdict of manslaughter because it “was sufficient to prove second degree murder.” The Louisiana Supreme Court reversed, noting that “in considering the nature of the offense, both the trial court and the reviewing court may assess whether the crime for which defendant has been convicted adequately describes his conduct when the conviction is for a lesser included responsive offense to the crime charged.” Id., 09-1404; 48 So.3d at 1078 (citing State v. Landos, 419 So.2d 475, 478 (La.1982). This general sentencing principle accommodates Louisiana’s responsive verdict scheme, which provides the fact-finder, ordinarily a jury in felony cases, the discretion to return verdicts for lesser included offenses against the weight of the evidence presented at trial. Id., 09-1404; 48 So.3d at 1078, citing State v. Porter, 93-1106 (La.7/5/94); 639 So.2d 1137, 1140.
Louisiana courts have found that the fact that the evidence might have supported a verdict of second degree murder is an appropriate sentencing consideration, where the defendant has been convicted of the lesser offense of manslaughter. See State v. Roussel, 424 So.2d 226, 231-32 (La.1982), overruled\won other grounds by State v. Jackson, 480 So.2d 263, 268; State v. Wooden, 572 So.2d 1156, 1161 (La.App. 1st Cir.1990).
In the present case, although Defendant was sentenced to 40 years for manslaughter and five years for negligent homicide, his sentence terms fall short of the life imprisonment the Louisiana legislature has deemed adequate to describe the moral culpability of his conduct. Moreover, Defendant was given credit for the 16 years he has already served.
Also, -with respect to Defendant’s 40-year sentence for manslaughter, the jurisprudence reflects that the maximum penalty has been imposed in the following similar circumstances.
*934 In State v. Batiste, 06-869; 958 So.2d at 27-28, this Court found a 40-year sentence for manslaughter was not constitutionally excessive where the defendant, who was 24 years old at the time of sentencing, deliberately pointed a gun at the victim and shot him four times without provocation, and the defendant’s actions endangered the lives of two bystanders. As in the instant case, the defendant in Batiste was originally charged with second degree murder and was found guilty of the lesser offense of manslaughter.
In State v. Jones, 05-735 (La.App. 5 Cir. 2/27/06); 924 So.2d 1113, 1118-19, writ denied, 07-0151 (La.10/26/07); 966 So.2d 567, this Court found a 40-year sentence for manslaughter was not constitutionally excessive, where the defendant had armed himself prior to the killing because of a previous confrontation with the victim, shot the victim four times in the face, and fled the state after the shooting. This Court also took into consideration that the defendant was charged with second degree murder and was found guilty of the lesser offense of manslaughter.
In Jones, this Court relied on State v. Lanieu, 98-1260 (La.App. 1 Cir. 4/1/99); 734 So.2d 89, 90-91, writ denied, 99-1259 (La.10/8/99); 750 So.2d 962, in which the First Circuit upheld a 40-year manslaughter sentence. In that case, the 19-year-old defendant, a first time offender, was charged with second degree murder and convicted of manslaughter. The defendant shot the victim in the head twice after a heated argument ensued in front of the defendant’s home.
In State v. Hyman, 09-409 (La.App. 5 Cir. 2/9/10); 33 So.3d 271, writ denied, 10-0548 (La.10/1/10); 45 So.3d 1094, this Court found no error in the trial court’s broad discretion in imposing a 40-year sentence on the defendant who was initially charged with second degree murder, but ultimately convicted of manslaughter. At sentencing, the trial court noted that the defendant created a risk to more than one person by firing on the victim, and that any lesser sentence would depreciate the seriousness of the offense. On appeal, this Court noted that the record revealed sufficient evidence to support a conviction for second degree murder. Further, as the sentencing judge noted, this Court took notice of the fact that the defendant had an opportunity to withdraw from the confrontation and chose not to do so, and that the defendant was not acting in self-defense.
Thus, we find that the manslaughter sentence imposed was not constitutionally excessive, and that the trial court did not abuse its discretion in imposing the maximum sentence when considered in light of the crime committed.
With regard to Defendant’s five-year sentence for negligent homicide, as previously asserted, the evidence at trial would have supported a second degree murder conviction with respect to the killing of Ms. Frazier and the exposure to a mandatory life sentence. LSA-R.S. 14:30.1.
After considering the severity of the crimes committed in this case, including the killing of an innocent bystander, Ms. Frazier, for which Defendant could have been convicted of second degree murder, we find that the five-year sentence imposed with respect to Defendant’s negligent homicide conviction is |S2neither grossly disproportionate to the offense, nor does it constitute a needless infliction of pain or suffering.
Finally, Defendant asserts that his sentences are excessive because they were ordered to be served consecutively, rather than concurrently. In determining whether sentences are excessive, this *935 Court should consider, among other factors, whether the convictions arise out of a single course of criminal conduct. State v. Ortego, 382 So.2d 921 (La.1980), cert. denied, 449 U.S. 848, 101 S.Ct. 135, 66 L.Ed.2d 58 (1980). When two or more convictions arise from the same act or transaction, or constitute parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively.[38] LSA-C.Cr.P. Art. 883.
A trial judge retains discretion to impose consecutive sentences on the basis of factors such as the offender’s past criminal acts, the violent nature of the charged offenses, or the risk that the defendant may pose to the safety of the community. State v. Williams, 08-556 (La.App. 5 Cir. 1/13/09); 8 So.3d 3, 9, writ denied, 09-330 (La.11/6/09); 21 So.3d 298. If the trial court elects to impose consecutive sentences for crimes arising from a single course of conduct, it must articulate the reasons it feels the sentence is necessary. Id. Although the imposition of consecutive sentences requires particular justification when the crimes arise from a single course of conduct, consecutive sentences are not necessarily excessive. Id., citing State v. Bradley, 02-1130 (La.App. 5 Cir. 3/11/03); 844 So.2d 115.
Issjln Williams, supra, this Court stated that LSA-C.Cr.P. art. 883 does not specifically require the trial court state reasons justifying the imposition of a consecutive sentence when the crimes arise out of a single course of conduct. Rather, the history of the jurisprudence reveals that the requirement for articulating specific reasons for imposing a consecutive sentence is based on LSA-C.Cr.P. art. 894.1, which requires a sentencing court to “state for the record the considerations taken into account and the factual basis therefore in imposing sentence.” Over time, the Louisiana Supreme Court has found that the failure to articulate reasons for sentencing pursuant to Article 894.1 does not require a remand when the sentence imposed is not “apparently severe,” and there is an adequate factual basis for the sentence contained in the record. Therefore, it logically follows that the failure to articulate specific reasons for imposing a consecutive sentence also does not require a remand if the record provides an adequate factual basis to support a consecutive sentence. Citing Bradley, supra.
According to the record in this case, the events occurred on the same day as a part of a common scheme or plan by Defendant, and the instant offenses were all part of the same transaction. Therefore, there was a presumption in favor of concurrent sentences under the article. Although the imposition of consecutive sentences requires particular justification when the crimes arise from a single course of conduct, consecutive sentences are not necessarily excessive. State v. Johnson, 97-867 (La.App. 5th Cir.4/15/98); 711 So.2d 848, writ denied, 98-1293 (La.10/9/98); 726 So.2d 20.
Immediately after stating the sentences would be consecutive, the trial judge stated:
*936 In spite of being part of Defendant’s actions on the same date October 14, 1994[,] the Court expressly finds that the Defendant’s actions were particularly negligent on the respective counts resulting j^in the violent deaths of two young people, and the potential deaths of others in the area.
The Court now makes a specific finding, the Defendant imposes an unusual risk to society thus warranting the consecutive sentences.
The trial judge in this matter articulated an adequate factual basis to support the imposition of consecutive sentences in this case. The total 45-year sentence, with credit for time served, imposed on Defendant is shorter than the life sentence for the charged offense of second degree murder. Moreover, as noted by the trial judge, Defendant posed an unusual risk to society as evidenced by the needless killings of two people during broad daylight, in an area with children, and by the use of a firearm in the commission of the crimes which could have impacted additional lives other than the two victims in this case.
Based on the foregoing, we find that in light of the facts of the case, the nature of the crimes and the jurisprudence, the sentences imposed were not constitutionally excessive, and the trial court did not abuse its discretion in imposing the maximum sentences for Defendant’s manslaughter and negligent homicide convictions.
Therefore, we affirm Defendant’s sentences.

Error Patent Discussion

The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 387 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The.review reveals no errors patent in this case.
DECREE
For the foregoing reasons, we affirm Defendant’s manslaughter and negligent homicide convictions and the respective 40-year and five-year sentences.

AFFIRMED

. The Court considered only one assignment of error: Harris’s Batson claim. The Court found racial discrimination in the State’s use of peremptory strikes. State v. Harris, infra.

. According to York, there were many people outside that day, including children who had just stepped off of the school bus.

. York testified that they were within arm's length of Defendant’s car at the time they crossed the street.

. Baptiste made a positive in court identification of Defendant whom she had seen pointing a gun out of the driver’s side window. Baptiste further testified that they were approximately four feet from Defendant’s car when the shooting occurred.

. York made a positive in court identification of Defendant as the individual who shot the victims in this case.

. McCall testified that Mr. Gordon is her son’s godfather.

. McCall observed the shooting from behind Defendant’s vehicle.

. McCall testified that the first time she saw Mr. Gordon with a gun that day was when a police officer arrived at the scene and took it off his person from around his waist.

. Riggs testified that only seconds passed from the time she bent down to pick up her wallet to the time she heard the gunshots.

. On cross-examination, Riggs testified that the victims were not near the car when they were shot because they were on the opposite side of the street.

. Major Pernia repeated the name "Irvin” to Mr. Gordon who confirmed “Irvin” as the shooter.

. The firearm, a Lorcin 380 semi-automatic pistol, recovered from the body of Mr. Gordon was admitted into evidence and submitted for ballistics testing. On cross-examination, Detective Thorton testified that the firearm removed from Mr. Gordon's body was loaded with 13 live rounds, one of which was in the chamber.

. Detective Thorton also identified numerous photographs that were taken of the crime scene and a sketch of the crime scene which he prepared, noting, that the bullet casings were recovered in two groups of four located between ten to fifteen feet apart and lying parallel to 1628 Betty, the building in front of which the victims were shot.

. Based on the ballistics material recovered, Detective Thorton testified on cross-examination that Ms. Frazier was only shot once and Mr. Gordon had been shot four times.

. Officer Tillman testified that the two victims' bodies were located approximately four to five feet apart.

. Issac also testified that Mr. Gordon would not take out his anger on him because he had a reputation in the drug community for "hurting people.”

. Defendant testified and corroborated Johnson’s testimony that Mr. Gordon pointed his finger at him and made a "gun motion.”

. Defendant testified during direct examination that he was aware of this incident.

. Frazier also testified that she had seen Mr. Gordon with a weapon before.

. Frazier further testified that, although she did not tell Defendant what she had heard Mr. Gordon say, she did ask him what was going on between him and Mr. Gordon. In response, Defendant told her "Mister tripping about some drugs, the drugs that had went bad.” And to Frazier’s understanding, she believed that "the drug deal went bad, and him and Mister was feuding.”

.On cross-examination, Frazier testified that Defendant specifically told her that he was going to get Mr. Gordon. During redirect, Frazier admitted that, at the previous trial held in this case, when asked whether she ever heard Defendant threaten to kill Mr. Gordon, she said "no.”

. Defendant testified that the problems with Mr. Gordon and himself started approximately one month before the shooting.

. Defendant also testified that Mr. Gordon threatened Ronald Singleton's family, a family that Defendant had been staying with at the time.

. Defendant admitted that he was the one who shot the victims. Defendant also testified that his cousin Sonny died a few years earlier.

.Defendant described “the circumstances" as the environment, i.e. broad daylight, with people outside. Defendant also testified that he was not wearing gloves while driving his car on the day of the shooting. Defendant further testified that the four women who testified that Defendant was in the passenger seat of the car were mistaken because he was driving.

. Defendant testified that he drove up to the victims from behind. He also testified that "everything happened so fast that he did not stop.” Defendant was impeached on this point during cross-examination, admitting that during his testimony in 1995, he testified that he did bring his car to a complete stop so he could speak with Ms. Frazier.

. On cross-examination the defendant testified that when he started "running” for Mr. Gordon, Mr. Gordon wanted him to have the gun to keep him from getting robbed, so the defendant bought the 9-mm Glock that was used to shoot the victims. Defendant also testified that prior to the day of the shooting, he had never fired a gun before, and did not know how many rounds of ammunition the gun contained.

. According to the defendant, he did not have to switch the safety of the gun off before firing at Mr. Gordon. He just grabbed the gun from the floorboard of his car, ducked, and squeezed the trigger.

. Mr. Gordon's criminal history consisted of criminal damage to property, unauthorized use of a moveable, and a speed limit violation.

. Compare, State v. Jackson, 06-565 (La.App. 5 Cir. 12/27/06); 948 So.2d 269, 273-74, where the defendant argued in his appellate brief that he killed the victim in self-defense, but presented no such evidence or theory at trial. This Court recognized that an appellate court need not consider a claim of self-defense raised for the first time on appeal. Nevertheless, this Court went on to discuss the merits of the self-defense argument and determined that the argument was without merit. In this case, Defendant argued throughout trial that the killings in this case were committed in self-defense; thus, it appears that Defendant has raised this issue at trial; accordingly, the merits of Defendant’s self-defense argument are addressed herein.

. Second degree murder, as it pertains to this case, is defined as the killing of a human being "[w]hen the offender has the specific intent to kill or to inflict great bodily harm[.]" Specific intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal con sequences to follow his act or failure to act.” LSA-R.S. 14:10. The determination of specific criminal intent is a question of fact. State v. Seals, 95-0305 (La. 11/25/96); 684 So.2d 368, 373, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997); State v. Gant, 06-232 (La.App. 5 Cir. 9/26/06); 942 So.2d 1099, 1111, writ denied, 06-2529 (La.5/4/07); 956 So.2d 599.

. Defendant claims he did not aim at the victims when he ducked and fired his weapon as he drove off in self-defense; however, the autopsy performed on the victims revealed that Ms. Frazier was shot once in the back, and Mr. Gordon was shot twice in the back, once in the hip and once on the left side of his body.

. It is also noted that no evidence was presented by Defendant regarding self-defense as to Ms. Frazier.

. In his appellate brief, Defendant addresses assignments of error numbers two and three jointly. Therefore, we will address them jointly in this opinion.

. The Louisiana Supreme Court has held there is no mandate that a trial court order a PSI and that it is merely an aid to the court and not a right of the accused. State v. Bell, 377 So.2d 275, 281 (La.1979) (citations omitted).

. It is noted that in its ruling on Defendant’s motion to reconsider sentence, the trial court references Defendant's "Letter to Court, Stamped as Filed on April 10, 2010;” however, the letter sent to the court by Defendant is stamped as filed on October 6, 2010. Also, the chronological index of this matter states that the October 6, 2010, letter was the only one found in the record. Thus, it appears that the trial court's reference to an April 10, 2010 letter, which would have been sent before Defendant’s sentencing on October 1, 2010, was a clerical error. Additionally, it is assumed that the trial court’s October 25, 2010 Order denying Defendant’s motion to reconsider sentence, disposed of Defendant’s handwritten request, as well as the formal motion filed by his attorney regarding reconsideration of his sentence.

. As noted by the State, several witnesses testified that at the location and time of the shooting, 3:00-3:15 on a Friday afternoon, a school bus was unloading children, there was a park in the vicinity, and two of the eyewitnesses were school aged children. Moreover, bullet holes were found in the window of an apartment complex directly behind where the victims were shot.

. Specifically, LSA-C.Cr.P. art. 883 provides:
If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently. In the case of the concurrent sentence, the judge shall specify, and the court minutes shall reflect, the date from which the sentences are to run concurrently.