814 So.2d 623 (2002)
STATE of Louisiana
v.
Mitchell JONES.
No. 2001-KA-0630.
Court of Appeal of Louisiana, Fourth Circuit.
March 20, 2002.
*624 Harry F. Connick, District Attorney, Juliet Clark, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellee.
Martin E. Regan, Jr., Regan & Associates, P.L.C., New Orleans, LA, for Defendant/Appellant.
Court composed of Judge MIRIAM G. WALTZER, Judge PATRICIA RIVET MURRAY and Judge MICHAEL E. KIRBY.
WALTZER, Judge.

STATEMENT OF CASE
The State indicted Mitchell Jones on 20 August 20, 1998, for the second-degree murder of Jeremiah Payne, in violation of La. R.S. 14:30.1, and the attempted second-degree murder of Patrick Bryant, in violation of La. R.S. 14:(27)30.1. Defendant pled not guilty, and, following jury trial on 1 March 1999, was found guilty of manslaughter on count one and attempted manslaughter on count two. The trial court denied defendant's motions for new trial and post verdict judgment of acquittal on 19 July 1999 and, on 23 July 1999, sentenced Jones to serve forty years on count one and twenty years on count two, sentences to run concurrently. That same day, the court denied defendant's motion to reconsider sentence, and granted his motion for appeal.

STATEMENT OF FACTS
On 28 June 1998, eighteen year old Jeremiah Payne attended a block party where he and defendant engaged in an altercation, during the course of which the defendant knocked out one of Payne's front teeth. Payne left the party, and went home to tend the injury. Mrs. Grace Payne, Jeremiah's mother, saw that he was very agitated, and attempted to dissuade him from returning to the party. *625 When Jeremiah did not heed his mother's request, Mrs. Payne called Jeremiah's cousin, Patrick Bryant, who spoke with Jeremiah on the phone. Bryant learned that Jeremiah was angry because he had lost a tooth in a fight, and wanted to fight again. Bryant told Jeremiah he was on his way to the Payne residence and asked Jeremiah to wait there for him. By the time Bryant arrived at the residence, however, Jeremiah had gone. Bryant rode his bike to North Miro and Bienville Streets looking for his cousin. When Bryant arrived at the location, he saw Jeremiah, the defendant, Calvin Scott and an unidentified man. As Bryant dismounted his bike, he saw Jeremiah approach the defendant. When Jeremiah was three to five feet from the defendant, Jeremiah put his hands up to fight. The defendant shot Jeremiah in the stomach. Jeremiah turned and ran back toward Bryant. The defendant ran after Jeremiah, and shot him in the back. As the defendant chased Jeremiah and ran past Bryant, Bryant grabbed the defendant's gun to stop him from shooting Jeremiah. The defendant shot Bryant in the stomach, causing Bryant to release his grasp on the gun, and flee in the same direction in which Jeremiah had already fled. The defendant pursued Bryant, shooting him a second time. Bryant saw Jeremiah fall, but continued running down Miro Street.
Drenise Bryant, Patrick Bryant's sister, was at her home located at Iberville and Miro Streets the night of the shooting. After she heard gunshots, she saw Jeremiah running and stumbling toward her, before he fell in her arms, bleeding. Her brother Patrick had also been shot, and continued to run down the street past her. Ms. Bryant testified that Jeremiah was unarmed, and not wearing a shirt.
Officers Kevin Thomas and John Mitchell responded to a shooting call on 28 June 1998, at North Miro and Bienville Streets at 10:45 p.m. As the officers proceeded to the scene, they encountered Patrick Bryant running in the 100 block of North Miro Street. Bryant explained that "Mitchell" shot him and the victim, and that the victim was lying on the sidewalk in the 200 block of North Miro Street. Officer Mitchell remained with Bryant, and called for medical assistance, while Officer Thomas went a block further, and found the dead victim, clothed only in black short pants and tennis shoes, lying on the sidewalk.
Detective Timothy Allen was the primary investigator and arrived at the scene within minutes of the shooting. Allen observed the unarmed, dead victim, shirtless and lying face down on the sidewalk. Neither bullet casings nor a gun were found on the scene. The following day, Allen spoke with Patrick Bryant, and learned that the shooter's first name was Mitchell, and that the shooter frequented the area of Bienville and Miro Streets. Allen compiled a photographic lineup from the information supplied by Patrick Bryant. When he showed the lineup to Bryant, Bryant identified the defendant as the shooter.
Calvin Scott testified on behalf of the defendant that on the day of shooting, the defendant related that he had been involved in a fight. As Scott and the defendant walked on Bienville Street, a car pulled up and someone jumped out of the car; it was dark, so Scott could not see who the person was. As Scott and the defendant stood on the sidewalk, Jeremiah Payne walked up, walking fast, "like he was mad about something." Jeremiah did not say anything, and just as Scott was about to tell him that the defendant did not want to fight anymore, shots rang out. Scott ran, so he did not see whether the defendant chased Payne or Bryant. Scott testified that he did not see Jeremiah with *626 a weapon, and corroborated other witnesses' testimony that Jeremiah was not wearing a shirt when he was shot. Scott claimed that he did not see who shot Jeremiah.
The defendant testified that around 2:00 p.m. on the day of the incident he attended a block party on Bienville and Derbigny Streets, near D & D Barroom, where he encountered Jeremiah Payne. He related prior run-ins with Payne, including one during which Payne threatened him with a gun. The defendant testified that on the day of the shooting, he had had several interactions with Payne. The first time the defendant saw Payne, he greeted him, but the victim said "What you mean, what happening" and "You don't want to shoot nothing." The next encounter occurred around 4:00 p.m., when the defendant was walking down Bienville Street, and Payne approached him from behind on a bike. The pair exchanged words, and the defendant claimed that Payne pulled a gun on him, whereupon the defendant walked away. Later that evening, around 10:00 p.m., the defendant again saw Payne, at which time Payne told the defendant "[y]ou better keep you head up" and "[w]ell you must want to see the man. If you want to see the man, holler at me, I've got the hook up if you want to the see the man." The men then engaged in a fistfight. At the end of the fight, Payne told the defendant that "it wasn't over" and warned the defendant to be around when he returned. The defendant was fearful that Payne would kill him when he came back, so he armed himself with a gun he had hidden under a nearby house. Ten minutes later, a car pulled up and a person ran toward the defendant. He could not tell who the person was, but as the person came within five feet of him, the person put his hand behind his back. The defendant drew his gun from his pocket, raised it up, closed his eyes, turned his head, and pulled the trigger. He testified he pulled the trigger two more times, hitting the victim in the back, before he opened his eyes and saw Payne running down Miro Street.
Dr. Alvaro Hunt, who testified by stipulation as an expert in forensic pathology, performed an autopsy on Payne on 29 June 1998. He noted that the victim was shot three times, at indeterminate distance in the left arm, abdomen and left back area. Two bullets were retrieved from the victim's body. Dr. Hunt also noted that the victim's upper left incisor tooth was missing.
The State and the defense stipulated that if Gerard Winbush were called to testify, he would confirm that the two bullets recovered during the autopsy were fired from the same weapon.

ERRORS PATENT
A review for errors patent on the face of the record reveals none.
FIRST ASSIGNMENT OF ERROR: The trial court erred by denying defendant's motion for mistrial when one of the State's witnesses commented upon the defendant's post-arrest silence.
On direct examination, Detective Timothy Allen testified that during the investigation into the shooting death of Jeremiah Payne, he found no evidence of self-defense on the part of the defendant. Allen explained that neither Payne nor Bryant was armed at the time they were shot.
Under cross-examination, defense counsel questioned Detective Allen concerning his training at the police academy as to when shooting a person is, and is not, justified. The State objected to the line of questioning; the court sustained the State's objections; however, defense counsel persisted in that line of questioning. *627 The following exchange occurred between Detective Allen and defense counsel:
Q. Officer, realistically you have no basis for your information that you gave the jury saying I've investigated to determine if it's self-defense or justified homicide. You don't have a basis that you bring there, you just assemble the facts in the street and you came to a conclusion that it was not.
A. Are you saying that I didn't investigate the possibility of
Q. No.
A. I will tell you this, everything that I have seen in connection with this case does not tell me its self-defense. I had tried to question your client at length and he refused to answer questions. And that is not something that someone who was forced to shoot somebody will do.
The United States Supreme Court has held that, because an accused's post-arrest silence is "insolubly ambiguous" and a jury is apt to draw inappropriate inferences from the fact that a defendant chose to remain silent, "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).
The Louisiana Supreme Court has indicated that, under the authority of C.Cr.P. art. 771, where the prosecutor or a witness makes a reference to a defendant's post-arrest silence, the trial court is required, upon the request of the defendant or the State, to promptly admonish the jury. In such cases where the court is satisfied that an admonition is not sufficient to assure the defendant a fair trial, upon motion of the defendant, the court may grant a mistrial. State v. Kersey, 406 So.2d 555, 559 (La.1981).
In this case, the trial judge admonished the jury:
... Ladies and gentlemen, I must admonish you to disregard the last answer from Detective Allen as having never been made. And I further instruct you that you are to disregard and not take any reference from the defendant's failure to make a statement to the New Orleans Police Department. The defendant has a constitutional right against self-incrimination and this privilege is a constitutional right. I further instruct you that this witness has no expert basis in which to render an opinion as to self-defense or justification. That is something that you draw a legal conclusion on after you hear the facts and after I instruct you on the law ...
Under the circumstances of this case, a mistrial was not mandatory. We find nothing in the record that would support the inference that the reference to defendant's post-arrest silence was made solely for the purpose of calling it to the jury's attention or having the jury make an inappropriate inference. See State v. Kersey, 406 So.2d at 559. When read in context with the entirety of Detective Allen's testimony, it is clear that the reference was made in an attempt to summarize the extent of the detective's investigation. Counsel for the defense pursued an improper line of questioning designed to elicit Detective Allen's opinion of the law of self defense over repeated, sustained objections from the State, and opinions regarding situations in which one is entitled to defend oneself. The trial court took adequate steps to insure that the defendant received a fair trial. Following the objection, neither the State nor the defense drew any further attention to the matter. Moreover, the trial judge admonished jurors to draw no adverse inferences from the defendant's post-arrest silence. *628 Given that one shooting victim unequivocally testified that Payne was unarmed, meant only to continue a fistfight with the defendant, and was pursued and shot in the back by the defendant, there was no evidence that the defendant shot the victim in self defense. This assignment is without merit.
SECOND ASSIGNMENT OF ERROR: The photographic lineup was prejudicial, and the defendant's witness, Calvin Scott, incarcerated at the time of trial, was brought into court in prison garb and handcuffs.
Out of the presence of the jury, the judge conferred with counsel on the defendant's objection to displaying the photographic line-up to the jury because the pictures depicted suspects with Bureau of Identification placards around their necks. Defendant argues on appeal that because the record is not clear that the jurors could not hear the discussion regarding the photographs, the jury may have been prejudiced by what they may have heard.
The record does not reflect that defense counsel lodged an objection, although counsel for the defendant did request that the door adjoining the area in which the jury was segregated be closed. A defendant cannot avail himself of an alleged error unless he made a contemporaneous objection at the time of the error, stating the specific ground of the objection, and he is limited on appeal to that ground articulated at trial. La.C.Cr.P. art. 841(A); State v. Buffington, 97-2423, (La.App. 4 Cir. 2/17/99), 731 So.2d 340, 346, quoting State v. Chisolm, 95-2028, (La.App. 4 Cir. 3/12/97), 691 So.2d 251, 255.
In this case, the photographic line up was not published to the jury. After the State offered its exhibits, including number eight, the photographic lineup, there was a bench conference. Following the bench conference the judge stated: "So, S-1, S-3, S-4, S-6, S-7 and S-9 publish to the jury?" The prosecutor replied: "Yes, ma'am." It is apparent that State's exhibit eight, the photographic lineup, was not published to the jury.
While the record in this matter indicates that Calvin Scott testified in orange prison garb, the record does not reflect that he appeared in shackles before the jury. Moreover, defense counsel did not object to the witness testifying in prison garb. As we have noted, defendant cannot avail himself of an alleged error absent evidence in the record of a contemporaneous objection at the time of the alleged error. La.C.Cr.P. art. 841(A).
We note from the record that Scott testified on direct examination that he was presently incarcerated in Orleans Parish Prison on unrelated charges, and on cross-examination, admitted that he pled guilty to armed robbery and attempted murder. Since Scott would be impeached with his recent convictions for two felonies, it is highly unlikely his appearance in civilian clothing would have enhanced his stature in the eyes of the jury. Thus, even had an objection been made and preserved, the error would be harmless under the circumstances of this case. This assignment is without merit.
THIRD ASSIGNMENT OF ERROR: Defendant was not afforded proper notification of the State's intent to use his inculpatory statement.
During the police investigation of this case, the police interviewed Tasha Hayes, who identified herself as Calvin Scott's girlfriend. Ms. Hayes reported that several days after the shootings, she witnessed a conversation between Calvin Scott and the defendant in which the defendant admitted that he shot the victims, and told Scott that he (the defendant) "would take his charge." Ms. Hayes testified *629 to the particulars of her police interview at trial.
C.Cr.P. art. 768 provides that:
Unless the defendant has been granted pretrial discovery, if the state intends to introduce a confession or inculpatory statement in evidence, it shall so advise the defendant in writing prior to beginning the state's opening statement. If it fails to do so a confession or inculpatory statement shall not be admissible in evidence.
This court discussed the issue of noncompliance with the C.Cr.P. art. 768 notice requirement in State v. Collins, 584 So.2d 356, 361-62 (La.App. 4 Cir.1991), as follows:
Where the defendant has been lulled into a misapprehension of the strength of the State's case by the failure to disclose fully, such prejudice may constitute reversible error. State v. Ray, 423 So.2d 1116 (La.1982); State v. Strickland, 398 So.2d 1062 (La.1981). However, the failure of the State to comply with discovery procedures will not automatically command reversal. Ray, supra. The reviewing court must review the record and make a determination of whether any prejudice which may have resulted from noncompliance has caused the trier of fact to reach the wrong conclusion. State v. Mitchell, 412 So.2d 1042 (La.1982); Strickland, supra. Failure to provide the defendant with correct Article 768 notice may be harmless error where the remaining evidence of guilt is overwhelming. State v. Jackson, 450 So.2d 621 (La.1984).
On the day of trial, prior to the swearing of the jurors and before opening statements, the State supplied the defense with notice of its intent to use the inculpatory statement made by the defendant in the conversation with Calvin Scott, which Ms. Hayes witnessed. Moreover, the defendant had been granted pre-trial discovery. On 9 February 1999, the State supplied the defense with a copy of the supplemental police report, which noted the contents of Mr. Hayes' interview, and listed the names of all witnesses interviewed by the police.
Even had the State failed in its duty to afford proper C.Cr.P. art. 768 notice, under the circumstances of this case, the error would not necessitate reversal of the defendant's conviction. There was no doubt the defendant shot the victims; he admitted he did. The only contested issue was whether the defendant acted in self defense. Additionally, the jury heard Scott and the defendant deny that they ever had the conversation purported to have been witnessed by Ms. Hayes. Considering the overwhelming evidence of the defendant's guilt, even if there was any error as to C.Cr.P. art. 768 notice, the error was surely harmless. This assignment is without merit.
FOURTH ASSIGNMENT OF ERROR: The evidence is insufficient to support defendant's convictions.
The standard for reviewing a claim of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Rosiere, 488 So.2d 965 (La.1986). The reviewing court is to consider the record as a whole and not just the evidence most favorable to the prosecution. If rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld. State v. Mussall, 523 So.2d 1305 (La.1988). Additionally, the reviewing court is not called upon to decide whether it believes the witnesses or *630 whether the conviction is contrary to the weight of the evidence. Id. The trier of fact's determination of credibility is not to be disturbed on appeal absent an abuse of discretion. State v. Bunley, XXXX-XXXX, p. 8 (La.App. 4 Cir. 12/12/01), 805 So.2d 292, 299-300.
In this case, although the defendant was charged with second degree murder, defined as the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm (La. R.S. 14:30.1 A(1)), the jury returned the responsive verdict of manslaughter, pursuant to La. R.S. 14:31, which provides in part:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.
"Sudden passion" and "heat of blood" are not separate elements of the offense but are mitigating factors, which the defendant must establish by a preponderance of the evidence. State v. McClain, 95-2546 (La.App. 4 Cir. 12/11/96); 685 So.2d 590.
The defendant does not dispute that he killed Payne and shot Bryant. He insists, however, that he shot the victims in self-defense because he feared they were going to kill him.
As noted by this court in State v. McClain, 95-2546 (La.App. 4 Cir. 12/11/96); 685 So.2d 590:
A homicide is justifiable if committed by one in defense of himself when he reasonably believes that he is in imminent danger of being killed or receiving great bodily harm and that the homicide is necessary to save himself from that danger. La. R.S. 14:20(1). When a defendant claims self-defense, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. State v. Lynch, 436 So.2d 567 (La.1983); State v. Brumfield, 93-2404 (La.App. 4 Cir. 6/15/94); 639 So.2d 312. Regarding self-defense, it is necessary to consider whether the defendant had a reasonable belief that he was in imminent danger of losing his life or receiving great bodily harm and whether the killing was necessary, under the circumstances, to save the defendant from that danger. State v. Dozier, 553 So.2d 911 (La.App. 4 Cir.1989), writ denied 558 So.2d 568 (La.1990). Although there is no unqualified duty to retreat, the possibility of escape is a factor in determining whether or not the defendant had a reasonable belief that deadly force was necessary to avoid the danger. Id. However, a defendant who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that the defendant desires to withdraw and discontinue the conflict.
In the instant case, the defendant argues that the facts showed that: 1) the victim was under the influence of alcohol; 2) the victim had committed prior acts of aggression against the defendant; 3) the victim was much larger than the defendant; and 4) the victim threatened to kill the defendant. For these reasons, the defendant argues that he had a reasonable belief that he was in imminent danger of *631 death or great bodily harm when he shot the victims.
Apparently the jury did not believe the defendant, and a review of the testimony does not indicate that the jury was in error when it rejected the self-defense plea. The defendant testified that he and Payne had a fistfight earlier on the day of the shooting. Although the defendant said he feared that Payne would return to kill him, he did not leave the area, even though it took Payne ten minutes to return and the defendant lived only a ten or fifteen minutes' walk from the area. Although there is no unqualified duty to retreat, the possibility of escape is a factor in determining whether or not the defendant had a reasonable belief that deadly force was necessary to avoid the danger. State v. McClain, 95-2546 (La.App. 4 Cir. 12/11/96); 685 So.2d 590. Instead of retreating, the defendant armed himself with a gun to wait for Payne's return.
The defendant admitted that when Payne returned, Payne was shirtless and that he did not see Payne armed with a weapon. Calvin Scott, a defense witness, also testified that he could see Payne's hands, and did not see a weapon. Scott testified that when Payne approached, the defendant fired his weapon.
Patrick Bryant testified that the defendant's first shot hit Payne in the stomach, whereupon Payne turned and fled. Nevertheless, the defendant pursued Payne, shooting him in the back. Viewed in the light most favorable to the State, the evidence clearly shows that after a wounded Payne fled for his life, the defendant chased him, and shot him in the back, at a time when self defense, if ever necessary in this case, was no longer an issue.
The same is true with respect to the shooting of Patrick Bryant. Bryant testified that he was shot in the abdomen while attempting to prevent the defendant from shooting Payne any more. Like Payne, Bryant was shot a second time while fleeing the scene.
It is clear that the defendant took no steps to avoid the incident; he armed himself, and continued to shoot the unarmed, wounded, fleeing victims, after it was obvious the victims posed no further threat to the defendant. The evidence is sufficient to support the verdicts of manslaughter and attempted manslaughter, and to prove beyond a reasonable doubt that the defendant did not act in self-defense. This assignment is without merit.
FIFTH ASSIGNMENT OF ERROR: Defendant's sentence is unconstitutionally excessive.
Although a sentence is within the statutory limits, the sentence may still violate a defendant's constitutional right against excessive punishment. State v. Sepulvado, 367 So.2d 762 (La.1979). A sentence is unconstitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless and needless imposition of pain and suffering, and is grossly out of proportion with the severity of the crime. State v. Lobato, 603 So.2d 739 (La.1992). The trial court has great discretion in sentencing within the statutory limits. State v. Trahan, 425 So.2d 1222 (La.1983). The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La.C.Cr.P. art. 881.4(D).
Generally, the reviewing court must determine whether the trial judge adequately complied with the guidelines set forth in La.C.Cr.P. art. 894.1 and whether the sentence is warranted in light of the particular circumstances of the case. State v. Soco, 441 So.2d 719 (La.1983). If adequate compliance with Article 894.1 is found, the reviewing court must determine *632 whether the sentence imposed is too severe in light of the particular defendant and the circumstances of the case. State v. Egana, 97-0318 (La.App. 4 Cir. 12/3/97), 703 So.2d 223. The articulation of the factual basis for the sentence is the goal of Article 894.1, not rigid or mechanical compliance with its provisions; and, where the record clearly shows an adequate factual basis for the sentence, resentencing is unnecessary even where there has not been full compliance with Article 894.1.
In sentencing the defendant, the court noted:
At this time I know both families are in the courtroom. We had a trial in this matter, it was an extensive trial with a lot of testimony on the case. And as everyone is aware, this case was originally that of a second degree murder. And there was testimony about the killing of Jeremiah Payne and also the shooting of Patrick Bryant in this case, Mr. Jones. And a lot of people wrote to me on your behalf and I read each of those letters. And I heard as well from the victim's mother in this case, who was the very first witness in the trial, if I remember correctly. And I remember her testimony very well about what she went through on that day when she tried to stop her son from going out, but he did, with the terrible results that happened after that. And how she called Patrick Bryant because she knew something bad was going to happen. But she thought it was just going to be a fistfight, the same thing that had happened earlier that day. But again, tragically, it wasn't. It was more than that. And the court read the PSI in this to give me some insight into what led up to this. Where you've been that got you to where you are. And the PSI, the presentence investigation report, doesn't control what I do it's merely a guideline for me to maybe give me some insight and help me in the sentencing on this case. The court has reviewed that presentence investigation report and the court has also taken into the sentencing guidelines in the Code of Criminal Procedure, 894.1. And the court is mindful of those guidelines when it's sentencing you and reaching a decision in this case. Again, one of the things that stuck out in the trial for me is that the victim in this case, the deceased victim, was shot multiple times and Patrick Bryant who survived the shooting was shot multiple times, once in the back. And that the only person from all the testimony, the only person that had a gun on the scene, was you. Therefore, the court is going to be taking into account the sentencing guidelines and the jury's verdict in this case, the jury did not come back guilty as charged. That I think they gave you a break when they came back with manslaughter and attempted manslaughter on Patrick Bryant ...
The defendant in this case fired multiple gunshots at two unarmed men, shooting both of them in the back at least once. Patrick Bryant's testimony shows that the defendant continued to fire at Jeremiah Payne after Payne, wounded by one bullet already, turned and began to flee. Under these circumstances, the defendant's concurrent sentences of forty years for manslaughter, and twenty years for attempted manslaughter are not excessive.
The defendant argues that his past experience with Payne "bespoke a climate of significant fear and anxiety," which should be considered a mitigating factor. However, the defendant chose not to leave the scene, and instead armed himself with a gun to wait for Payne to return to resume the fistfight. Moreover, the defendant testified that in an earlier fight, he knocked *633 Payne's tooth out. Payne was not wearing a shirt and was obviously unarmed. This assignment is without merit.

CONCLUSION
For the foregoing reasons, we affirm defendant's convictions and sentences.
CONVICTIONS AND SENTENCES AFFIRMED.