STATE OF LOUISIANA      *      NO. 2022-KA-0594

VERSUS      *

     COURT OF APPEAL

TRAE WILLIAMS      *

     FOURTH CIRCUIT

     *

     STATE OF LOUISIANA

\* \* \* \* \* \* \*

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 522-053, SECTION "D"
Judge Kimya M. Holmes,
\* \* \* \* \* \*
**Judge Karen K. Herman**
\* \* \* \* \* \*

(Court composed of Chief Judge Terri F. Love, Judge Karen K. Herman, Judge
Nakisha Ervin-Knott)

Meghan Harwell Bitoun
LOUISIANA APPELLATE PROJECT
P.O. Box 4252
New Orleans, LA 70178-4252

COUNSEL FOR DEFENDANT/APPELLANT

Jason Rogers Williams
District Attorney
PARISH OF ORLEANS
Brad Scott
Assistant District Attorney
Chief of Appeals
Thomas Frederick
Assistant District Attorney
619 S. White Street
New Orleans, LA 70119

COUNSEL FOR STATE OF LOUISIANA/APPELLEE

**CONVICTION AND SENTENCE AFFIRMED**
**May 8, 2023**

KKH
TFL
NEK

Trae Williams, the defendant, appeals his conviction and sentence for manslaughter. For the reasons that follow, we affirm.

## I.

On October 2, 2014, the defendant was indicted for the second degree murder of Eddie Salvant, III, in violation of La. R.S. 14:30.1. He entered a plea of not guilty at his arraignment on October 15, 2014. After hearings on the defendant's motions to suppress evidence, statements, and identification on October 21, 2015, the trial court denied relief on each.

On June 12, 2017, a trial by jury commenced and on June 14, 2017, a mistrial was declared when the jury reported that it was unable to reach a verdict.

The defendant was retried on April 23, 2018, and the jury returned a verdict of guilty of the lesser included offense of manslaughter by a 10-2 vote. The defendant's post-verdict motions were denied and, after being adjudicated a second-felony offender, he was sentenced to sixty years at hard labor. On September 20, 2018, the trial court granted his motion for appeal.

On appeal, this Court reversed that conviction, finding that inadmissible hearsay evidence had been admitted by the trial court and that this error was not harmless. *State v Williams*, 2019-0186 (La. App. 4 Cir. 9/25/19) 280 So.3d 1185.

On June 12, 2020, the Louisiana Supreme Court reversed this Court's ruling, finding that the inadmissible hearsay that formed the basis of the Fourth Circuit's reversal had not been the subject of a contemporaneous objection by defense counsel at trial, and therefore was not preserved for appellate review. However, because Williams's direct appeal was pending when the United States Supreme Court decided *Ramos v. Louisiana*, 590 U.S. __, 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020), the matter was remanded to this Court to conduct a new error patent review in light of *Ramos*. *State v. Williams*, 2019-01690 (La. 6/12/20), 347 So.3d 632.

Pursuant to *Ramos*, this Court vacated the conviction and remanded back to the trial court for further proceedings. *State v Williams*, 2019-0186 (La. App. 4 Cir. 9/9/20), __ So.3d ___.

On March 7, 2022, the State of Louisiana amended the indictment to charge the defendant with manslaughter and to add the firearm enhancement pursuant to La. C.Cr.P. art. 893.3(E). On March 8 and 9, 2022, the defendant was tried for a third time and found guilty as charged. Following the denial of his post-trial motions on April 6, 2022, he was sentenced to 28 years at hard labor without benefit of parole, probation or suspension of sentence on May 4, 2022. A motion to reconsider sentence was filed on June 1, 2022, and on June 6, 2022, that motion was granted in part and denied in part in that the trial court did not reduce the term of imprisonment but did recommend that he be placed in any self-help programs operated by the Department of Corrections. This timely appeal followed.

II.

THE EVIDENCE ADDUCED AT TRIAL

*Testimony of Tshe Salvant*

Tshe Salvant ("Tshe") was the first witness to testify for the prosecution. She identified herself as the daughter of the victim, Eddie Salvant, III. Tshe was asked to explain to the jury the family dynamics in the Williams-Salvant family. Her grandmother was Verna Williams ("Verna"), who was married to Curtis Williams, Sr. ("Curtis Williams"). Verna and Curtis Williams were the parents of Curtis Williams, Jr., the father of the defendant. Verna was the mother of three other children fathered by Eddie Salvant, II: Anna, Giselle and Eddie, III, the victim. Thus, the defendant was the victim's nephew and Tshe's first cousin.

Tshe went on to testify that the Salvant and Williams sides of the family did not get along well. This acrimony had manifested itself in early April 2014 when Curtis Sr. and the victim got into an altercation about Verna visiting Anna in the hospital. Tshe described a telephone conversation with her father on April 8, the day before he was killed, where they discussed that altercation. Her father's demeanor in that conversation so troubled Tshe that she dropped what she was doing and rushed over to see him.

Arriving just minutes later, Tshe found her father on the phone with his sister, Giselle. Tshe recalled that her father was angry and was holding a knife. Over the defense's objection, Tshe went on to detail her father's words that night where he explained that someone had been sent by defendant "to lure him out and that's why he had the object that was in his hand." Worried for her father's safety, Tshe begged him to spend the night in a motel and, when he would not, stayed

with him until 4:00 a.m. She claimed that her father had called the police, but they did not arrive before she left.

With a photograph labeled Exhibit 1, Tshe was also able to orient the jury to where the family members lived in relation to one another. She and her father lived at 1422 Eliza Street with her father in an upstairs apartment and Tshe downstairs. Verna and Curtis Williams, Sr. lived next door in a residence facing Leboeuf Street, where the defendant also resided.

*Testimony of Sgt. Mark McCourt*

Sgt. Mark Mc Court was the next witness called by the State. He explained his assignment as liaison between the New Orleans Police Department ("N.O.P.D.") and the Orleans Parish Communications Division, and the custodian of records as it relates to authenticating 911 records for courtroom purposes. He then authenticated a CD containing the 911 call in this case. That CD was then played for the jurors.

Under cross-examination, Sgt. Mc Court admitted that the defendant's name was not mentioned in the 911 call.

*Testimony of Dr. Erin O'Sullivan*

The State began the second day of its presentation with the testimony of Dr. Erin O'Sullivan, the forensic pathologist who autopsied the victim. After testifying to her qualifications and education, the defense did not traverse the predicate, and the trial court qualified Dr. O'Sullivan as an expert in forensic pathology.

She then testified that she performed the autopsy on the victim on April 10, 2014, and after receiving the results from the toxicological analyses, issued the New Orleans Forensic Center Coroner's Report on May 16, 2014. She identified a

4

diagram she created depicting where the victim's gunshot wounds were located but explained that the numbering in the diagram was arbitrary and not intended to connote the severity or order of injury. Dr. O'Sullivan identified the likely cause of the victim's death as what she labeled Entrance No. 1, where the bullet entered at the top of the shoulder at the base of the left side of the neck and perforated the cervical inlet, the area just above the ribs, the left lung, and the arch of the aorta, the liver, and bowel. She testified that the trajectory of the bullet was described as if the person was standing in an anatomic position as depicted in the diagram. The bullet would have traveled downward and left to right. The injury and trajectory were consistent with someone falling to the ground. She further explained that she was able to recover the projectile from the victim's body and then identified the package containing it.

Dr. O'Sullivan went on to identify a second gunshot wound to the left thigh, and opined that, had the victim been properly treated, that wound would have been survivable. Her attention then was directed to superficial abrasions on the victim's knees, abdomen, shoulder and knuckles, which she testified could have been caused when the victim fell to the ground. Ultimately, Dr. O'Sullivan concluded that the cause of death was homicide.

On cross-examination, Dr. O'Sullivan agreed that the abrasions likely occurred contemporaneously with the shooting and that they could have been caused in a number of ways. When asked about the absence of gunpowder residue, she explained that, unless there was some intervening medium, the gun would had to have been fired from a distance of more than two to three feet from the victim. Defense counsel then asked Dr. O'Sullivan about a scenario where the victim was standing erect when he was shot: Dr. O'Sullivan testified that because the victim

5

was seventy inches tall, the gun would have had to be seven feet above the ground for the bullet to have taken the path it took. Alternatively, she testified that had the victim been bent over at the waist when the shot was fired, the bullet could have taken the path it took.

*Testimony of Detective Theophilus Kent*

The next witness called by the prosecution was Theophilus Kent, a N.O.P.D. veteran of 22 years. Detective Kent related that he had worked in the homicide division for 11 years and that he was the lead investigator in the murder of Eddie Salvant, III. He recalled that he arrived at the scene of the killing, the corner of Leboeuf and Elizardi Streets in Algiers, at approximately 4:45 p.m. When he arrived, police units and civilians were already on the scene as was the victim's lifeless body. In addition to ascertaining from those on the scene what happened, Detective Kent assisted and directed crime scene technicians in photographing the scene and collecting evidence.

Detective Kent identified 32 photographs of the crime scene, as well as three diagrams depicting distances of items of evidentiary value vis-à-vis the victim's body. He explained to the jury that no DNA or ballistic evidence was retrieved at the scene. The victim's body was searched, and no weapon or contraband was located. Also while on the scene, members of the victim's family identified the victim's body and related that he resided in the area of Eliza and Leboeuf. Kent had other officers canvass the area for witnesses. Though the canvassers were unsuccessful in locating witnesses, Kent explained that they obtained information that developed one and only one suspect – the defendant.

A follow-up investigation was conducted the next day, including a renewed search for witnesses. These efforts were likewise fruitless.

About one month later, with the help of concerned citizens in the area, Detective Kent was able to locate an eyewitness to the shooting, Kendall Sylve. Sylve was in the custody of the Orleans Parish Sheriff's Office when Detective Kent located him. Detective Kent brought Sylve to N.O.P.D. Homicide Division and took a videotaped statement. In that interview, another detective presented Sylve with a photographic lineup containing the defendant's picture. This procedure was a double blind lineup where the presenting detective does not know who the suspect is so as to preserve the integrity of the procedure. The prosecutor's efforts to elicit from Detective Kent what Sylve said during this procedure were thwarted when the trial court sustained defense counsel's objections.

Detective Kent went on to describe two subsequent interviews with Sylve, one involving a different lineup procedure. Although the detective was precluded from reiterating what Sylve said, he did testify as to the procedure used to memorialize a lineup procedure. He explained that a form is read to the witness prior to presenting the photographic lineup and the witness is shown the photographic lineup. At that point, the investigator asks if they recognize anybody and how they recognize them. Following this line of questioning, the prosecutor again solicited what Sylve said and, over the defendant's objection, Kent was permitted to tell the jury that in this second lineup procedure Sylve identified the defendant as the person who committed the crime. Following that identification, Kent authored an application for an arrest warrant on July 16, 2014, and effected the arrest of the defendant.

On cross-examination, defense counsel had Kent explain that the police arrived at the scene of the shooting within five minutes of the shots being fired. He also recalled that civilians with towels were trying to aid the victim when the

police arrived and that these people had to be removed from the victim's side to prevent the loss of evidence. Detective Kent conceded that no physical evidence was found at the scene that tied the defendant to the murder.

Defense counsel also had Detective Kent point out in crime scene pictures that the victim's mother's house on Leboeuf Street was located on a double lot enclosed by a solid wood fence. Counsel then reviewed the crime scene diagrams to establish that the distance from where the victim lay to the intersection of Leboeuf and Eliza Streets was 40 feet and about six feet from the sidewalk on Eliza Street. Cross-examination concluded with Kent conceding that Sylve failed to come forward to any of the 25 officers on scene on the day of the shooting, and that it was not until May 8, 2014, that Sylve first disclosed he had information about the crime.

*Testimony of Sean McElrath*

N.O.P.D. Forensic Firearms Examiner Sean McElrath was called by the prosecutor and qualified as an expert in the field of ballistics examination and firearm testing. Even though no firearm was recovered in the investigation of Mr. Salvant's murder, McElrath was called by the state to classify the caliber of the one copper jacketed projectile recovered by Dr. O'Sullivan during the autopsy. He measured the base of the projectile and determined it to be .355 of an inch, which is indicative of .38 caliber class ammunition. He explained that such a projectile could be fired from several firearms of a .38 caliber class including a .38 Special, 357, 9mm, .380 automatic, and .38 Smith & Wesson. McElrath concluded the direct examination by telling the jury that if a revolver was used, a shell casing would not be ejected unless the gunman manually did so.

8

*Testimony of Detective Tanisha Sykes Smith*

Detective Kent's colleague at the N.O.P.D. Homicide Division, Detective Tanisha Sykes Smith, testified that on May 8, 2014, she presented the initial double-blind lineup to a witness who was brought to her office from jail. At the time she administered the photographic lineup, Det. Smith was unaware of the facts of the case, including the identity of the suspect. She recalled that the witness was able to make an identification but refused to sign the N.O.P.D. lineup form. She said the handwriting on the form was not hers and that "[s]omebody wrote on here that Kendall Sylve has identified No. 3 and they put Trae on here."

*Testimony of Kendall Sylve*

Kendall Sylve followed Detective Smith to the witness stand. On direct examination, he introduced himself to the jury as a 50-year-old Algiers resident who has struggled with drug addiction and dealt drugs since he was a child. He also admitted to having been convicted of drug, burglary, and weapons charges prior to getting his life straightened out.

When asked by the prosecutor why he was testifying, Sylve said that he had changed his life and was now drug-free. He described life on the streets where it is "forbidden to be sitting here testifying against anybody," but said he now wanted to do the right thing.

Sylve told the jury that in April 2014 he was in the throes of a heroin addiction and that on the date of the killing of Mr. Salvant, he was around Eliza and Leboeuf Streets waiting to buy heroin. To pass the time until the seller arrived, he was shooting basketball with an acquaintance named "Baby T." They were using a basketball goal that was in the street in front of the house next door to Verna's home.  He related that while playing basketball, he saw the victim, whom

he knew from the neighborhood as "Beanie," coming out of Verna Williams's home while the defendant was seen passing Beanie on his way into the house.

At some point while shooting the ball, it bounced off of the goal and rolled down the street towards Eliza Street. Sylve recalled that he went to retrieve the ball and, as he stooped to pick it up, heard gunshots. He looked up and saw the defendant shoot the victim. When asked for detail, he added that the defendant was shooting the victim as the victim fell to the ground. Sylve explained that he had known Trae Williams since the defendant was a little boy in the neighborhood.

After the shooting, Sylve returned to the basketball goal and rejoined Baby T. As they stood there, he watched as the defendant walked past with a black revolver in his hand. He saw the defendant go upstairs into another building, then watched him exit the rear of that building and go through the yard to the street behind, Whitney Avenue.

The police arrived while Sylve stood outside, but he did not speak with them. At one point he saw members of the victim's family point him out, and he believed that was because he had recently had an argument with Beanie over a $10 debt. He elaborated saying that the argument was just blowing off steam and that he and Beanie had resolved the matter.

He saw the defendant on two occasions following the shooting, once at a mall and a second time when the defendant drove by in a car. In the former, the two did not speak. When they saw one another a second time, he recalled that the defendant asked him what the word on the street was regarding the victim's death.

Syle was arrested at some point after the murder on misdemeanor possession of stolen property charges. While in jail, he was visited by Detective Kent and asked about Beanie's killing, but he did not disclose any information because he

10

did not want to get involved. But when he heard rumors that he was being named as a suspect in the crime and his misdemeanor charges were upgraded to burglary, he changed his mind and met with Kent. This time he looked at a photographic lineup and identified the defendant, though he refused to sign his name on the Eyewitness Identification form. He described meeting with the police at the District Attorney's Office on another occasion and this time identifying the defendant as the man who killed the victim, and watching as Detective Kent wrote the words he had spoken.

On cross-examination, Sylve reiterated that he met with Kent three times. Defense counsel reviewed with Sylve the escalation of the charges he faced and the evolution of what he told them about the shooting on Leboeuf Street. Sylve agreed that when he first met with Detective Kent on May 8, 2014, he was facing misdemeanor stolen property charges, and on that occasion he told Kent he did not see the shooting. When they next met on May 19, and he now was charged with three burglaries, he identified a photograph of the defendant in a lineup but did not say he saw the shooting.

Defense counsel then questioned Sylve about the meeting attended by Sylve, his lawyer, Detective Kent and someone from the District Attorney's Office in June. At that meeting, Sylve said for the first time that he saw the defendant shoot Beanie. Sylve then agreed that two weeks after that meeting two of the burglary charges were refused by the District Attorney and the parties agreed to a sentencing range of four to 12 years, depending upon the level of Sylve's cooperation in the prosecution of the defendant. Ultimately, Sylve served a sentence of three years.

11

On redirect, Sylve confirmed that he had heard his name associated with the murder the second time he spoke with Det. Kent and he wanted to clear his name. That interview was videotaped. The video was introduced into evidence and a portion was played for the jury. This concluded the state's case.

*Testimony of Bianca Banks*

The defense presentation consisted of the testimony of Bianca Banks, a lifelong resident of the Leboeuf and Eliza Streets neighborhood. She identified herself as the person who called 911 after the shooting. She explained that she was taking her child to visit his grandmother on Thayer Street, which runs parallel to Leboeuf Street one block away. Near the corner of Leboeuf and Eliza Streets, she saw people playing basketball and others sitting on the back of a car. As she prepared to turn onto Thayer Street from Eliza, she heard gunshots. She immediately picked up her child and carried him for half a block, then put him down and instructed him to go to his grandmother's home. She returned to Leboeuf and Eliza and saw the victim on the ground shaking and apparently still alive. She called 911.

When asked if she saw the shooter, Ms. Banks would only say she "caught a glimpse" of a man dressed in blue jeans and a white shirt running away from her position. She testified that she was unable to identify the shooter. Banks further stated that she did not know the victim, his family or the defendant.

She then recalled that after the police arrived and she was at her child's grandmother's home, she learned that an acquaintance of her aunt had been arrested. Someone asked her to tell the police that this man was not involved in the crime, and she spoke to Detective Green about that.

On cross-examination, Banks identified her voice when the prosecutor replayed the recording of the 911 call. After listening to that, Ms. Banks agreed that her description of the man she saw included that he was a brown complexioned black man dressed in blue jeans and a white shirt. When questioned about what she saw of the actual shooting, she said she saw the gunman shoot the victim, saw the victim fall to the ground and saw the gunman continued to shoot the victim.

The defense rested its case. The state elected to not present rebuttal evidence.

III.

ERRORS PATENT

A review of the record for errors patent on the face of the record reveals none.

IV.

ASSIGNMENTS OR ERROR

*Assignment of Error Number One*

In his first assignment of error, the defendant contends that the trial court improperly instructed the jury to continue deliberating by issuing a coercive *Allen* charge.  However, our review of the trial transcript reflects that the defendant failed to place a contemporaneous objection to the trial court's instruction on the record. Instead, the issue was first raised by defense counsel in defendant's motion for new trial. Moreover, with respect to the challenged charge, we are of the opinion that it was not a coercive *Allen* charge.

The record before us establishes that, after a two-day trial, the jury retired to deliberate after 8 p.m. on the second day. At 12:30 a.m., the jury returned to say that it was deadlocked.  The trial court consulted with the state and defense counsel

13

prior to bringing the jury back into the courtroom, stating that she would re-read a portion of the jury instructions to the jury and then "ask them if they believe that further deliberations will aid them in reaching a verdict and we will take it from there." Defense counsel then asked the trial court to re-read the previously given instruction and the trial court said it would. Defense counsel expressed her agreement to that proposal.

When the jury reentered the courtroom, the following colloquy took place:

THE COURT:

We're back on the record. It is 12:30 a.m. The question I received from the jury is we cannot come to a unanimous verdict, and I want to read to you the jury instructions again on your duty to deliberate. Which is, when you enter the jury room, you should consult with one another, consider each others [*sic*] views and discuss the evidence with the objective of reaching a just verdict. Each of you must decide the case for yourself, but only after discussion and impartial consideration of the case with your fellow jurors. You are not advocates for the State or the Defense. Do not hesitate to re-exam [sic] your own views and to change your opinion if you are convinced you are wrong, but do not surrender your honest belief as to the weight and effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of rendering a verdict. You understand, and I have said to you that it is 12 of you, for a verdict to be returned, it has to be unanimous, correct?

JUROR:

Correct.

THE COURT:

We have been at this now, you went out at 8:14, I'm sorry 8:16. So you've been at it four hours and 16 minutes. My question to you is do you believe that further deliberations will aid you in coming to a unanimous verdict?

JUROR:

At this point I would say no.

THE COURT:

> State and Defense approach.
> (Counsel approach bench.)

> THE COURT:

> All right. I've read to you the jury instructions on your duty to deliberate. We are trying to deliberate to a just verdict in this case. I'm going to send you back up. If you have any other questions, you can again just give it to the deputy, and again, write that question down and give it to the deputy, and if you have another question, we'll receive you in court for your question or your verdict.

Again, defense counsel said nothing about this exchange being coercive in nature, and the jury returned to its deliberations.

As provided in La. C.Cr.P. art. 841, an irregularity or error cannot be availed after verdict unless it is objected to at the time of the occurrence. *See also State v. Knight*, 323 So.2d 765, 769 (La. 1975); *State v. Alexander*, 430 So.2d 621 (La. 1983). Accordingly, this assignment of error was not properly preserved for review.

In his brief the defendant maintains that a contemporaneous objection was lodged but it apparently went unheard by the trial court and the court reporter. Assuming *arguendo* that a timely objection was raised, we disagree with the defendant's contention that the above quoted colloquy was a prohibited *Allen* charge.

An *Allen* charge refers to jury instructions intended to break a deadlocked jury. The term refers to the opinion rendered by the Supreme Court in *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896) where it discussed additional jury instructions given after the jury had returned from deliberations seeking further guidance as follows:

> [T]hat in a large proportion of cases absolute certainty could not be expected; that, although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his

fellows, yet they should examine the question submitted with candor, and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, on the other hand, the majority were for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority.

*Allen*, 164 U.S. at 501, 17 S.Ct. at 157.

*Allen* charges are disfavored in Louisiana for two reasons: (1) the charge emphasizes that the jury has a duty to reach a verdict, implying that the trial judge will not accept a mistrial; and (2) "'when the duty to reach a verdict is coupled with an admonition by the trial judge that those in the minority should rethink their position, there exists an almost overwhelming pressure to conform to the majority's view.'" *State v. Alvarez*, 2000–0819, pp. 14–15 (La. App. 4 Cir. 7/18/01), 792 So.2d 875, 885 (citations removed). In *State v. Collor*, 99-0175, p. 13, (La. App. 4 Cir. 4/26/00); 762 So.2d 96, 104, this Court discussed the *Allen* charge and the reasons it may be problematic, stating, "First, the charge emphasizes that the jury has a duty to reach a verdict, implying that the trial judge will not accept a mistrial. Second, when the duty to reach a verdict is coupled with an admonition by the trial judge that those in the minority should rethink their position, there exists an almost overwhelming pressure to conform to the majority's view."

In *Collor*, the jury had only been deliberating for an hour when it announced it was deadlocked. The trial court asked if extra time would be helpful in reaching a verdict and suggested that "there's always a possibility that some people might be able to be convinced." 99-0175, p. 14, 762 So.2d at 104. This Court held that

the trial judge did not abuse his discretion in asking the jury to continue deliberations, because the impermissible elements of the *Allen* charge were not present in that case, and in considering the gravity of the offense and that the jury had only deliberated for an hour. *Id.*, at p. 15, 762 So.2d at 105.

Here, the charge excerpted above does not include either of the two shortcomings identified by Louisiana jurisprudence. The trial court simply re-read the jury instructions on deliberations, exactly as defense counsel had requested. Furthermore, the trial court did not insinuate that the jurors in the minority should yield to the views of the majority; nor did the trial judge tell the jurors they had a "duty to reach a verdict, implying that the trial judge will not accept a mistrial." *Collor*, 762 So.2d at 104.

For the above stated reasons, this issue has no merit.

*Assignment of Error Number Two*

In his second assignment of error, the defendant argues that the trial court deprived him of his right to a public trial by requiring the jury to continue its deliberations late into the night and after the courthouse had been closed to the public. Like the first assignment, this issue was not preserved for review because the defendant did not contemporaneously object or otherwise raise this issue at any point during the jury's deliberations. Furthermore, there is no evidence in the record that provides factual support for this assignment.

"In a criminal case, the accused is afforded the right to enjoy a public trial by both the United States Constitution and the Louisiana Constitution. U.S. Const. amend. VI; La. Const. art. 1, § 16." *State v. Baumberger*, 2015-1056, p. 29 (La. App. 3 Cir. 6/1/16), 200 So.3d 817, 837. Defendant argues that his right to a public

trial was violated when the trial continued beyond the time that the courthouse was open to the public.

In *Weaver v. Massachusetts*, ___ U.S. ___, 137 S.Ct. 1899, 1910, 198 L.Ed.2d 420 (2017), the United States Supreme Court recognized that even in the absence of any prejudice, an alleged denial of a public trial raised on direct appeal, "**where there is an objection at trial**," will generally entitle the defendant to "automatic reversal."
(Emphasis added.)

The record indicates that the jury initially retired for deliberations around 8:00 p.m. When the trial court recessed to await the jury's deliberation, defense counsel said nothing about the lateness of the hour or that the courthouse was closed. At approximately 10:30 p.m., the jurors sent a note asking if they could review transcripts of the testimony of two witnesses. The trial court explained that they would have to rely on their memory. Again, nothing was put on the record by defense counsel at this juncture regarding the closing of the courthouse or the inability of the public to attend the deliberations. In the final colloquy between the jurors and the trial court concerning the difficulties in reaching a verdict, defense counsel made no mention of the defendant's right to a public trial. This issue was not preserved for review on appeal.

In its brief, the state takes issue with the defendant's assertion that the public could not attend the deliberation, pointing out that "it is the practice of the Criminal District Court to keep Sheriff's deputies posted at the front door of the courthouse when trials continue past the typical closing time." While that may or may not be true, there is no evidence in the record to support the defendant's

assertion that members of the public could not enter the courthouse to view the trial after 4:00 p.m. For these reasons, this assignment of error is without merit.

*Assignment of Error Number Three*

Defendant next contends that the cumulative effect of the state's hearsay evidence was reversible error. More specifically, he first complains that Kendall Sylve's videotaped interview with NOPD homicide detectives should not have been played for the jury. Additionally, the defendant maintains it was error to permit Tshe to recount the telephone and in person conversations with her father in the hours before his murder. For the following reasons, we disagree.

Prior to trial, the defense moved *in limine* asking the trial court to exclude the videotaped statement made by Sylve that had been played at the prior trial. In that motion the defendant argued that the recording was an out-of-court statement offered for the truth of the matter asserted and that it would be used to improperly bolster Sylve's testimony at trial. The trial court refused to rule on the motion finding it was premature. When the issue arose at trial, the state maintained it was admissible pursuant to the hearsay exception under La. C.E. art. 801 D(1)(b), in that it was intended to rebut a claim of recent fabrication or improper motive. Defense counsel replied Sylve had lied in every statement he made, whether to clear his own name and to curry favor with the state in hopes for leniency in his own cases, and that La. C.E. art. 801 D(1)(b) was therefore inapplicable. The trial court overruled the defendant's objection and permitted the recording to be played.

This Court has long held that a trial court's ruling on the admissibility of evidence should not be overturned absent an abuse of discretion. *See State v. Brown*, 97-2260, p. 8 (La. App. 4 Cir. 10/6/99), 746 So.2d 643, 648 (applying the abuse of discretion standard to a trial court's ruling on the admissibility of

19

hearsay). In this instance we hold that the trial judge properly exercised that discretion.

The defendant's brief, like his pretrial motion *in limine*, focused on the "recent fabrication" aspect of La. C.E. art. 801(D)(1)(b). That article provides:

> D. Statements which are not hearsay. A statement is not hearsay if:
>
> (1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:
>
> (a) In a criminal case, inconsistent with his testimony, provided that the proponent has first fairly directed the witness' attention to the statement and the witness has been given the opportunity to admit the fact and where there exists any additional evidence to corroborate the matter asserted by the prior inconsistent statement;
>
> (b) Consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication **or improper influence or motive;**
>
> (c) One of identification of a person made after perceiving the person; or
>
> (d) Consistent with the declarant's testimony and is one of initial complaint of sexually assaultive behavior.
>
> (e) A statement made by the victim of a sexually oriented criminal offense to a healthcare provider during the course of a forensic medical examination as defined in R.S. 15:622 and the healthcare provider has documented that statement in writing during the course of the forensic medical examination.

(Emphasis added.)

As early as his opening statement, the defendant made Sylve's credibility the crucial issue in this case. Clearly, in cross-examination defense counsel implied that Sylve fabricated his story to get a deal from the prosecution, and focused their cross-examination on factors that arose only after the May 8, 2014 interview. Given that focus, the state was entitled to rebut the contention of improper influence or motive for Sylve's testimony. We find that the trial court properly permitted the state to play the recording pursuant to La. C.E. art. 801(D)(1)(b).

The defendant also takes issue with the admission of Tshe's testimony as to what was said during her phone call with the victim the day before his death regarding his argument with Curtis Williams. Additionally, the defendant maintains that the trial court erred when it permitted Tshe to further testify that in a conversation at his apartment sometime after the phone call, the victim had told her that he had learned from someone that the defendant had asked that person to "lure" the victim out of his apartment. This testimony was also the subject of a pretrial motion *in limine.* The trial court denied the motion prior to trial. The defense objected to this testimony during the trial, and the objections were overruled.

The issue of the statements made during the phone call was conclusively litigated on appeal from the previous conviction. Upon review of defendant's second trial, the Louisiana Supreme Court reversed this Court's ruling regarding the phone call testimony finding:

> The district court did not err in admitting testimony as to the victim's telephone call to his daughter of the victim's fearful state of mind and present sense impression of the altercation. *See State v. Magee*, 11-0574, p. 48 (La. 9/28/12), 103 So.3d 285, 319.

*Williams*, 2019-01690 (La. 6/12/20), 347 So.3d 632.

We concur with that reasoning and will not revisit that issue here.

As to the statements made by the victim about the attempt to lure him from his apartment, we again conclude that the trial court was within its discretion in admitting these statements under La. C.E. art 803(3), which provides a hearsay exception for "[t]hen existing mental, emotional, or physical condition." The Louisiana Supreme Court's discussion of this exception in *State v. Magee*, 2011-0574, pp. 38-50 (La. 9/28/12), 103 So.3d

21

285, 314-20, is helpful. In *Magee*, the defense challenged the admission of a letter written by the defendant's wife a month before he murdered her, as well as testimony by her cousin of what the wife told her about an altercation three days before the murder. While the Louisiana Supreme Court found that portions of the letter relating to past abuse were improperly admitted (but harmless error), it also held that the portions of the letter explaining the wife's then-existing state of mind that the marriage was over and her desire to separate from her husband were "relevant and admissible under La. C.E. art. 803(3) to prove her subsequent acts in the days leading up to her murder and to explain why the immediate antecedent circumstances of the murder unfolded in the way they did." *Id*. at 317. As to the cousin's testimony regarding the altercation three days before the murders, the Louisiana Supreme Court noted that in homicide cases, the statements of the decedent in the time leading up to their demise are often particularly relevant in providing context to the circumstances of their death, as they explain why the decedent took actions that they did. *Id*. at 319-20.

The rationale in *Magee* applies to the exchange between Tshe and her father in the hours preceding his death. The victim's knowledge that the defendant was plotting to attack him gave important context to why he felt the need to arm himself and why he was in an agitated state. The trial court did not err in permitting the jury to hear this testimony.

*Assignment of Error Number Four*

In his final assignment, the defendant asserts the sentence he received was excessive. We disagree.

22

In *State v. Smith*, 2001-2574, p. 7 (La. 1/14/03), 839 So.2d 1, 4, the Court set forth the standard for evaluating a claim of excessive sentence:

Louisiana Constitution of 1974, art. I, § 20 provides, in pertinent part, that "[n]o law shall subject any person to … *excessive … punishment*." (Emphasis added.) Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness. *State v. Sepulvado*, 367 So.2d 762, 767 (La.1979). A sentence is unconstitutionally excessive when it imposes punishment grossly disproportionate to the severity of the offense or constitutes nothing more than needless infliction of pain and suffering. *State v. Bonanno*, 384 So.2d 355, 357 (La.1980). A trial judge has broad discretion when imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. *State v. Cann*, 471 So.2d 701, 703 (La.1985). On appellate review of a sentence, the relevant question is not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion. *State v. Walker*, 00-3200, p. 2 (La.10/12/01), 799 So.2d 461, 462; cf. *State v. Phillips*, 02-0737, p. 1 (La.11/15/02), 831 So.2d 905, 906.

An appellate court reviewing a claim of excessive sentence must determine whether the trial court adequately complied with the statutory guidelines in La. C.Cr.P. art. 894.1, as well as whether the facts of the case warrant the sentence imposed. *State v. Trepagnier*, 97-2427, p. 11 (La. App. 4 Cir. 9/15/99), 744 So.2d 181, 188. However, as noted in *State v. Major*, 96-1214, p. 10 (La. App. 4 Cir. 3/4/98), 708 So.2d 813, 819:

The articulation of the factual basis for a sentence is the goal of [La. C.Cr.P. art.] 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, resentencing is unnecessary even when there has not been full compliance with [La. C.Cr.P. art.] 894.1. *State v. Lanclos*, 419 So.2d 475 (La.1982). The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La. C.Cr.P. art. 881.4(D).

If the reviewing court finds adequate compliance with La. C.Cr.P. art. 894.1, it must then determine whether the sentence the trial court imposed is too severe in light of the particular defendant as well as the circumstances of the case, "keeping

in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged." *State v. Landry*, 2003-1671, p. 8, (La. App. 4 Cir. 2/31/044), 871 So.2d 1235, 1239; *State v. Bonicard*, 98-0665 (La. App. 4 Cir. 8/4/99), 752 So.2d 184.

Although the trial court did not enumerate or refer to any of the sentencing factors listed in La. C.Cr.P. art. 894.1, the record appears to support the sentences imposed. The evidence introduced at trial shows that defendant shot his uncle multiple times in broad daylight on a public sidewalk. This conduct would support a significantly harsher sentence than the sentence defendant received, but the trial court considered that the background of the killing was a "family situation gone horribly wrong" and took the wishes of family members into account. With the defendant facing a maximum sentence of 40 years, we hold that the trial court did not abuse its broad sentencing discretion by determining that a 28-year sentence was appropriate in this case. *See State v. Bell*, 2002-2349, (La. App. 4 Cir. 8/6/03), 854 So.2d 429, (forty-year sentence not excessive for first offender defendant who stabbed her lover and was charged with second degree murder, but convicted of manslaughter); *State v. Jones*, 2001-0630, (La. App. 4 Cir. 3/20/02), 814 So.2d 623, (forty-year sentence not excessive for first offender originally charged with second degree murder, but convicted of manslaughter in the shooting death of a man with whom he had fought earlier the same night); *State v. Soriano*, 2015-1006 (La. App. 3 Cir. 6/1/16), 192 So.3d 899, (upholding forty-year sentence imposed upon first offender originally charged with second degree murder, convicted of manslaughter in connection with stabbing death of victim); *State v. White*, 48,788, (La. App. 2 Cir. 2/26/14), 136 So.3d 280, (upholding forty-year sentence imposed upon first offender defendant who shot the victim, was charged with second degree

murder, but convicted of manslaughter); *State v. Harris*, 2011-626, (La. App. 5 Cir. 11/27/12), 105 So.3d 914, (forty-year sentence not excessive for defendant charged with second degree murder in connection with shooting death of victim, convicted of manslaughter). Based on the above, the defendant's assertion that his 28-year sentence for manslaughter was excessive is without merit.

## CONCLUSION

For the foregoing reasons, we affirm Trae Williams's conviction and sentence.

**CONVICTION AND SENTENCE AFFIRMED**